No. 26-1183

IN THE UNITED STATES COURT
OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

IN RE MEDIA AND DEMOCRACY PROJECT,

*Petitioner*.

_____

**PETITION FOR A WRIT OF MANDAMUS TO REDRESS
AGENCY ACTION UNREASONABLY DELAYED BY THE
FEDERAL COMMUNICATIONS COMMISSION**

_____

Daniel G. Jarcho
6106 Harvard Avenue
Unit 126
Glen Echo, MD  20812
daniel.jarcho@gmail.com
Phone:  (771) 241-9634

*Counsel for Petitioner*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

THE RELIEF SOUGHT ...........................................................................................1

ISSUES PRESENTED................................................................................................2

JURISDICTION..........................................................................................................2

STATEMENT OF FACTS AND PROCEDURAL HISTORY ..............................4

    A.    Statutory and Regulatory Background ....................................................4

        1.    The Character Policy.................................................................5

        2.    The License Renewal Process...................................................7

    B.    The Commission Proceedings Relevant to this Case............................8

        1.    MAD's Petition to Deny Renewal of the Fox Station's License ......................................................................................8

        2.    Complaints About Broadcasts by ABC, CBS, and NBC Stations Regarding the 2024 Presidential Election..................11

        3.    Bureau-Level Denials in the Fox, ABC, CBS, and NBC Station Proceedings on the Same Day ....................................13

        4.    Expedited Revival of the ABC, CBS, and NBC Station Proceedings Immediately After the 2025 Presidential Inauguration ..........................................................................13

        5.    MAD's Application for Review by the Full Commission.......14

REASONS WHY THE WRIT SHOULD ISSUE .................................................15

I.    THE COURT SHOULD ORDER THE COMMISSION TO ACT ON THE APPLICATION BECAUSE THE AGENCY'S DELAY IS EGREGIOUS...............................................................................................15

    A.    The Commission Violated a "Rule of Reason" Prohibiting Disparate Treatment of Similarly-Situated Parties ...........................16

        1.    The Four Proceedings are Similarly Situated ..........................17

        2.    The Agency Has Treated MAD's Matter Differently Than the Other Three Matters Without a Rational Basis for Doing So ................................................................................19

B.    Legitimate Competing Agency Priorities Do Not Provide a Justification for the Disparate Treatment ................................................ 21

C.    The Court Need Not Reach the Question Whether the Agency Had an Improper Purpose, But Substantial Contextual Evidence Supports That Concern ...................................................................... 22

D.    The Interests Prejudiced by Delay Justify Relief .............................. 28

II.    IN THE ALTERNATIVE, THE COURT SHOULD AUTHORIZE MAD TO TAKE DISCOVERY REGARDING THE REASONS FOR DELAY ................................................................................................. 31

CONCLUSION ....................................................................................................... 34

ADDENDUM .......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Int'l v. FCC,*
  885 F.3d 687 (D.C. Cir. 2018)................................................................16

*Ala. Power Co. v. FCC,*
  773 F.2d 362 (D.C. Cir. 1985)...............................................................18

*American Hosp. Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016)..............................................................2, 3

*Amerijet International, Inc. v. Pistole,*
  753 F.3d 1343 (D.C. Cir. 2014)..............................................................20

*ANR Storage Co. v. FERC,*
  904 F.3d 1020 (D.C. Cir. 2018)..............................................................18

*BNP Paribas Energy Trading GP v. FERC,*
  743 F.3d 264 (D.C. Cir. 2014)...............................................................19

*Bodomov v. U.S.,*
  No. 07-cv-1482, 2007 WL 4373052 (E.D. Pa. Dec. 14, 2007) ...........................33

*Burka v. NYC Transit Auth.,*
  110 F.R.D. 660 (S.D.N.Y. 1986) .............................................................33

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.,*
  403 F.3d 771 (D.C. Cir. 2005)...............................................................19

*Children First Found., Inc. v. Martinez,*
  2007 WL 4344915 (N.D.N.Y. Dec. 10, 2007) ..................................................33

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026)......................................................................29

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019)......................................................................23

*Grayscale Investments, LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) ................................................................. 16, 18

*Illinois Citizens Committee for Broadcasting v. FCC*,
    515 F.2d 397 (D.C. Cir. 1975) ...................................................................30

*In re Aitken County*,
    645 F.3d 428 (D.C. Cir. 2011) ...................................................................29

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ...................................................................19

*In re Barr Laboratories, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) .................................................... 4, 22, 28, 32, 33

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ...................................................................3, 4

*In re Center for Biological Diversity*,
    53 F.4th 665 (D.C. Cir. 2022) ................................................................. 15, 22

*In re Core Communications, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ...................................................................16

*Int'l Telecard Ass'n v. FCC*,
    166 F.3d 387 (D.C. Cir. 1999) ...................................................................4

*LePage's 2000, Inc. v. Postal Regulatory Comm'n*,
    642 F.3d 225 (D.C. Cir. 2011) ...................................................................18

*Lilliputian Systems, Inc. v. Pipeline and Hazardous Materials Safety
    Administration*,
    741 F.3d 1309 (D.C. Cir. 2014) ...................................................................16

*Lovitky v. Trump*,
    949 F.3d 753 (D.C. Cir. 2020) ...................................................................3

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dept. of Veterans Affairs*, 842
    F. Supp. 2d 127 (D.D.C. 2012) ...................................................................33

*Prairie Band Potawatomi Nation v. Yellen*,
    63 F.4th 42 (D.C. Cir. 2023) ...................................................................18

*Public Health Citizen Research Group v. Commissioner, Food & Drug Admin.*,
740 F.2d 21 (D.C. Cir. 1984) ...................................................................33

*San Francisco Baykeeper v. Whitman*,
297 F.3d 877 (9th Cir. 2002) ..................................................................32

*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987) ................................................................29

*Sinclair Wyoming Ref. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024) ...............................................................16

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ...................................................................30

*Telecomms. Research & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ............................ 2, 3, 15, 16, 21, 22, 23, 28, 32, 33

*The Cherokee Nation v. U.S. Dept of the Interior*,
531 F. Supp. 3d 87 (D.D.C. 2021) ..........................................................33

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977).................................................................23

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*,
985 F.3d 472 (5th Cir. 2021) ..................................................................18

*Williams v. City of Boston*,
213 F.R.D. 99 (D. Mass. 2003)...............................................................33

*Yakubova v. Chertoff*,
No. 06-cv-3203, 2006 WL 6589892 (E.D.N.Y. Nov. 2, 2006) ...........................33

STATUTES

5 U.S.C. § 551(10) ................................................................. 17, 18

5 U.S.C. § 555(b) .....................................................................3

5 U.S.C. § 706(1) .....................................................................32

28 U.S.C. § 1651(a) ..................................................................2

47 U.S.C. § 155(c)(1)..................................................................2

47 U.S.C. § 155(c)(4) ……………………………………………...…3

47 U.S.C. § 301 ...................................................................................4

47 U.S.C. § 308(b) ..............................................................................5

47 U.S.C. § 309(a) ............................................................................17

47 U.S.C. § 309(k)(1)......................................................................7, 8

47 U.S.C. § 402(b)(1)..........................................................................3

47 U.S.C. § 402(b)(6)……………………………………………………3

**RULES**

47 C.F.R. § 73.1020(a).........................................................................7

47 C.F.R. § 73.4280 ............................................................................5

**OTHER AUTHORITIES**

In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing,
102 FCC 2d 1179 (1986) .................................................. 5, 6, 7

In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing,
5 FCC Rcd 3252 (1990).................................................................5, 6

*Petition for Rulemaking to Establish Standards for Determining the Standing of a Party to Petition to Deny a Broadcast Ap*plication,
Memorandum Opinion and Order, 82 FCC 2d 89 (1980) ..............................8, 31

Letter to Anne L. Weismann from Barbara A. Kreisman, Chief, Video Division, Media Bureau, FCC,
28 FCC Rcd 6312 (MB 2013)...............................................................6

## **INTRODUCTION**

The Court should issue a writ of mandamus compelling the Federal Communications Commission to take final action in an unreasonably-delayed television licensing proceeding.  Three years ago, petitioner Media and Democracy Project (MAD) petitioned the Commission to deny renewal of the license held by a Fox television station in Philadelphia.  The Commission's Media Bureau denied the petition.  MAD filed an Application for Review of the Media Bureau decision by the full Commission.  Seventeen months later, the Commission has refused to act on that Application.  In stark contrast, the agency has expedited action on similar matters involving sanctions against television stations owned by ABC, CBS, and NBC.  This disparate treatment of MAD's challenge to the Fox station's license renewal warrants prompt intervention by the Court.

## **THE RELIEF SOUGHT**

MAD respectfully requests the Court to issue a writ of mandamus compelling the Commission to take action on a pending Application for Review of a television-station licensing decision by the Commission's Media Bureau.  In the alternative, MAD respectfully requests the Court to authorize MAD to take discovery into the reasons the Commission has delayed action on that Application, to enhance the record before the Court rules on this mandamus request.

## ISSUES PRESENTED

1.   Whether the Commission has unreasonably delayed ruling on MAD's Application for Review.

2.   Whether the Court should invoke its previously-recognized authority to order a "special factual inquiry" into the reasons for the Commission's delay.

## JURISDICTION

The All Writs Act, 28 U.S.C. § 1651(a), gives this Court jurisdiction to issue a writ of mandamus compelling unreasonably-delayed agency action.  *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76-77 (D.C. Cir. 1984) (hereinafter "*TRAC*").  This case satisfies the three threshold jurisdictional requirements for the Court to issue a writ of mandamus:  a "clear duty" for the agency to act, a "clear right to relief," and the "absence of an alternative remedy."  *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

The agency has a clear duty to act.  The Commission delegated, to the Media Bureau, the authority to act on MAD's petition.  *See* 47 U.S.C. § 155(c)(1).  The Communications Act of 1934 specifies that "[a]ny person aggrieved by" an order issued under such delegated authority "may file an application for review by the Commission" and that "every such application *shall be passed upon* by the Commission."  *Id*. § 155(c)(4) (emphasis added).  Construing the statutory term "shall" as a mandatory command, this Court recently confirmed that the full

2

Commission has a "nondiscretionary obligation to 'pass[ ] upon' [a] pending application for review of [a] Media Bureau Order."  Order, *Broadband Communications Ass'n of Pennsylvania v. FCC*, No. 26-1062 (D.C. Cir. April 28, 2026) (citing section 155(c)(4)).[1]

There also is a clear right to relief.  Because the statute requires the agency to comply with a clear duty to act, MAD has a "corresponding right to demand that compliance."  *American Hosp. Ass'n*, 812 F.3d at 192; *see also Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (existence of a "clear right to relief and clear duty to act" are "often" determined "concurrently").[2]

Finally, there is no alternative remedy.  At this time, MAD cannot pursue an appeal in this Court.  The Court has exclusive jurisdiction to hear appeals "from decisions and orders of the Commission" by "any . . . person who is aggrieved or whose interests are adversely affected by any order of the Commission granting" an application for a "station license."  47 U.S.C. §§ 402(b)(1), (b)(6); *TRAC*, 750 F.2d at 75.  But a decision by Media Bureau subordinates is not a final decision of "the

---

[1] The Administrative Procedure Act (APA) further mandates that the agency "shall" satisfy that decision-making duty "within a reasonable time."  5 U.S.C. § 555(b); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000).

[2] The "clear right to relief" is the right to demand relief (pertaining to the jurisdictional question whether the Court *could* order relief), as distinguished from the merits question whether the Court *should* order relief, which we discuss separately below.  *American Hosp. Ass'n*, 812 F.3d at 190.

3

Commission." An appeal filed after a bureau decision but before resolution by the full Commission is premature. *Cf. Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999).

Furthermore, no remedy is available in a district court. Where, as here, a statute explicitly grants this Court exclusive jurisdiction to review final agency action, the Court "retain[s] exclusive jurisdiction 'to hear suits seeking relief that might affect [its] future statutory power of review.'" *In re Bluewater Network*, 234 F.3d at 1310 (citation omitted). Those include "mandamus actions challenging an agency's unreasonable delay." *Id*. at 1310-11. Here that exclusive jurisdiction empowers the Court to compel delayed agency action or order a "special factual inquiry" regarding the agency's reasons for delay. *In re Barr Laboratories, Inc*., 930 F.2d 72, 74-75 (D.C. Cir. 1991).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Statutory and Regulatory Background

To operate a television station, a broadcaster must obtain a license from the Commission. 47 U.S.C. § 301. In both the initial licensing and license renewal contexts, the Communications Act requires the Commission to allocate those licenses to persons that will serve the "public interest, convenience, and necessity." *Id*. §§ 307(a), 309(a).

4

### 1.      The Character Policy

To ensure that a licensee operates in the public interest, the Communications Act charges the Commission with prescribing, by regulation, the "facts . . . as to . . . character" a license-renewal applicant must have.  47 U.S.C. § 308(b).  The Commission has adopted such regulations, which incorporate by reference a number of detailed Character Policy statements.  47 C.F.R. § 73.4280.  Consistent with the First Amendment, the Character Policy regulates licensee "conduct," not broadcast "content" — focusing on conduct that will help the Commission "predict whether an applicant has or lacks the character traits of 'truthfulness' and 'reliability' that [the Commission has] found relevant to the qualifications to operate a broadcast station in accordance with the requirements of the Communications Act and of [the Commission's] rules and policies."  In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing, 102 FCC 2d 1179 (1986) (hereinafter "1986 Character Policy Statement") at 1195.

The Commission focuses its character evaluation on the operation of a licensee's broadcast stations.  But that evaluation also can cover misconduct at a broadcast licensee's corporate parent or affiliates (even if they are not broadcast entities subject to licensing by the Commission).  In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing, 5 FCC Rcd 3252 (1990) (hereinafter "1990 Character Policy Statement") at 3252 ("Because of the

5

interrelationship of the mass media, we see no reason to limit our focus to broadcast related violations."); 1986 Character Policy Statement at 1218-19; Letter to Anne L. Weismann from Barbara A. Kreisman, Chief, Video Division, Media Bureau, FCC, 28 FCC Rcd 6312, 6318 n. 65 (MB 2013).

Misconduct at the non-broadcast parent or affiliates is known as "non-FCC" misconduct. The Commission focuses its evaluation of non-FCC misconduct on actions relevant to "the character traits of 'truthfulness' and 'reliability.'" 1986 Character Policy Statement at 1195.

Given that it is an agency with narrow expertise, the Commission generally only considers non-FCC misconduct if it has been adjudicated by an independent tribunal. 1986 Character Policy Statement at 1195-1208; 1990 Character Policy Statement at 3253. However, the Commission may consider non-FCC misconduct — whether or not it has been independently adjudicated — if it is so "egregious" that it "shocks the conscience":

> The Commission acknowledges that there may be circumstances in which an applicant has engaged in nonbroadcast misconduct so egregious as to shock the conscience and evoke almost universal disapprobation. . . . Such misconduct might, of its own nature, constitute *prima facie* evidence that the applicant lacks the traits of reliability and/or truthfulness necessary to be a license, and might be a matter of Commission concern even prior to adjudication by another body.

1986 Character Policy Statement at 1205 n. 60. This case arises from such egregious misconduct proved by evidence that an independent factfinder — a Delaware state court — held was undisputed.

## 2.    The License Renewal Process

In general, the Commission grants a license for a period of eight years, after which the license may be renewed for additional eight-year terms. *See* 47 C.F.R. § 73.1020(a). The Communications Act provides that the Commission "shall grant" the renewal if it finds that the applicant has (during the preceding license term) served the public interest, convenience, and necessity and that there have been no serious or abusive statutory or regulatory violations. 47 U.S.C. § 309(k)(1). If the Commission determines (after notice and opportunity for hearing) that the licensee has failed to meet the foregoing standards, it may either deny the application or grant the application subject to specific terms and conditions. *Id*. § 309(k)(2).

Interested parties have the right to petition the Commission to deny the renewal. To evaluate a petition to deny, the Commission first determines whether the petition contains "specific allegations of fact sufficient to show that . . . grant of the application would be prima facie inconsistent with" the statutory renewal standards. *Id*. § 309(d)(1). If the petition does allege a prima facie case, the Commission determines whether there is a "substantial and material question of fact." *Id*. § 309(e). If there is a disputed material factual question, or the

7

Commission is otherwise unable to find that renewal is warranted, it "shall formally designate the application for hearing on the ground or reasons then obtaining . . . ." *Id*.

If the petition is denied, the petitioner may pursue the channels for administrative and judicial review described above.

### B.    The Commission Proceedings Relevant to this Case

#### 1.    MAD's Petition to Deny Renewal of the Fox Station's License

On July 3, 2023, MAD filed a petition to deny the renewal of the license for television station WTXF in Philadelphia.  Ex. A.  MAD is a non-partisan, volunteer-led, grassroots civic membership association fighting for a more informative and pro-democracy media that operates in the public interest.[3]  The station's owner is Fox Television Stations, LLC, whose ultimate parent company is Fox Corporation.

As relevant here, the petition alleged a violation of the Character Policy based on actions by the station's cable-television sister company (Fox News Network) and by the common overarching management that controlled both the broadcast station

---

[3] The petition was joined by MAD members Milo Vassallo (the organization's Executive Director) and John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman (who filed declarations confirming that they are regular viewers of the station).  Ex. A at 1; Ex. 3 to Ex. A.  Regular viewers of a station have standing to petition to deny renewal of its broadcast license, and an association has such standing if one of its members does.  *Petition for Rulemaking to Establish Standards for Determining the Standing of a Party to Petition to Deny a Broadcast Application*, Memorandum Opinion and Order, 82 FCC 2d 89, 98-99 (1980).

8

and the cable sister (Rupert and Lachlan Murdoch, respectively the Chair and Chief Executive Officer of Fox Corporation). MAD's petition charged that Fox News (knowingly supported by the Murdochs) had knowingly disseminated false news about the 2020 presidential election — purely for reasons of financial gain — and thereby contributed to civil unrest in the country (namely the attack on the U.S. Capitol on January 6, 2021). The petition requested the Commission to conduct a hearing into the extent of Fox's (and the Murdochs') willfulness in the misrepresentations, to determine whether that non-FCC misconduct violated the Character policy. Ex. A at 10.

MAD's petition argued that Fox had engaged in misconduct that "shocked the conscience." MAD's petition relied upon the decision of a Delaware state court, which had independently adjudicated and confirmed critical aspects of the misconduct.[4] The court had issued an order granting partial summary judgment to the voting-machine company Dominion in a defamation case against Fox Corporation and the Fox News Network. Dominion alleged that Fox had deliberately and falsely claimed that Dominion had manipulated the 2020 election to steal votes from President Trump and give them to President Biden. Referring to information disseminated by Fox, the Delaware court found that "*[t]he evidence*

---

[4] The state court decision is attached as Ex. 1 to Ex. A.

*developed in this civil proceeding demonstrates that it is **CRYSTAL** clear that none*

*of the Statements relating to Dominion about the 2020 election are true*."[5]

The Delaware court found (and entered summary judgment regarding) the

following specific facts (all of which were undisputed by the Fox entities):

- Fox falsely claimed that Dominion committed election fraud by rigging the 2020 Presidential Election;[6]

- Fox falsely claimed that Dominion's software and algorithms manipulated vote counts in the 2020 Presidential Election;[7]

- Fox falsely claimed that Dominion is owned by a company founded in Venezuela to rig elections for the dictator Hugo Chavez;[8] and

- Fox falsely claimed that Dominion paid kickbacks to government officials who used its machines in the 2020 Presidential election.[9]

MAD's petition also recited substantial evidence, from the Delaware case,

demonstrating that the false statements were intentional and motivated by the

economic threat that Fox would lose substantial numbers of pro-Trump viewers if it

did not persist with the falsehoods.[10]  MAD further argued that the evidence (in the

---

[5] Ex. A at 15; Ex. 1 to Ex. A at 43 (emphasis in original).

[6] Ex. A at 15; Ex. 1 to Ex. A at 39-41.

[7] Ex. A at 15; Ex. 1 to Ex. A at 41-42.

[8] Ex. A at 15; Ex. 1 to Ex. A at 42.

[9] Ex. A at 15; Ex. 1 to Ex. A at 42.

[10] Ex. A at 4-8; Ex. 1 to Ex. A at 14-15, 50-57.  The Delaware court denied summary judgment on issues of intent pertinent to defamation, after concluding that there were

*(footnote continued on next page)*

10

Delaware case and supplementing the petition) proved that Rupert and Lachlan Murdoch knew that Fox was disseminating false information.  Given those individuals' positions at the apex of the Fox corporate structure, MAD argued that their conduct raised material questions about their character qualifications to be broadcast licensees.[11]

### 2. Complaints About Broadcasts by ABC, CBS, and NBC Stations Regarding the 2024 Presidential Election

While MAD's petition to deny was pending, the group Center for American Rights filed complaints with the Commission stemming from broadcasts carried on ABC, CBS, and NBC stations regarding the upcoming 2024 presidential election. On September 24, 2024, that group filed a complaint against an ABC station concerning the presidential debate produced by the ABC network two weeks earlier. The complaint alleged that ABC correspondents had treated President Trump unfairly by fact-checking his statements during the debate, thereby engaging "news distortion" that the station disseminated in violation of its public interest obligation.

---

multiple genuine issues of material fact.  Ex. 1 to Ex. A at 64.  And Fox did not appeal.  Rather, before the intent issues reached trial, Fox settled the case, reportedly by paying Dominion $787 million.  Ex. A at 3.  Fox accompanied the settlement with a statement that "acknowledge[d] the Court's rulings finding certain claims about Dominion to be false."  Fox News Media, *Fox News and Dominion Voting Systems Reach Settlement* (April 18, 2023), https://press.foxnews.com/2023/04/fox-news-and-dominion-voting-systems-reach-settlement.

[11] Ex. A at 4-5, 13.

The complaint requested the Commission to issue a public reprimand.  Ex. B at 15-17.

On October 16, 2024, the same group complained that a CBS station had allegedly engaged in news distortion by choosing to distribute a "60 Minutes" interview with Vice President Kamala Harris.  The complaint alleged that 60 Minutes producers and correspondents had illegitimately altered the interview by featuring the Vice President's recorded answer to a question that was different than her recorded answer, to the very same question, broadcast the day before on "Face the Nation."  The complaint called for the Commission to investigate the underlying facts.  Ex. C at 2-5.

Finally, on November 4, 2024, the same group filed a complaint against an NBC station alleging a violation of the Commission's "equal time" rule (which requires broadcast stations to give equivalent opportunities to competing political candidates under some circumstances).  The complaint involved a pre-election NBC network broadcast of "Saturday Night Live" featuring a 90-second appearance by Vice President Harris in a comedy sketch and alleged that NBC had not offered an equivalent appearance opportunity to then-candidate Trump.  The complaint requested the Commission to impose a fine on the station.  Ex. D at 3.

### 3. Bureau-Level Denials in the Fox, ABC, CBS, and NBC Station Proceedings on the Same Day

The Commission consolidated MAD's challenge to the Fox license in the same docket with the proceedings regarding the ABC, CBS, and NBC stations. On January 16, 2025, pertinent Commission bureaus denied relief in all four proceedings. Exs. E, F, G, H. The same day, the Commission's Chairwoman issued a single statement that covered all four proceedings, providing the same general rationale for the denials (preserving the First Amendment). Ex. I. The Commission posted all of the January 16 actions together on the same web page. https://www.fcc.gov/document/fcc-chairwoman-rosenworcel-acts-preserve-first-amendment.

### 4. Expedited Revival of the ABC, CBS, and NBC Station Proceedings Immediately After the 2025 Presidential Inauguration

Six days later — immediately following President Trump's inauguration — the pertinent Commission bureaus *sua sponte* reopened the proceedings involving the ABC, CBS, and NBC stations. In all three matters, the reopening orders used identical language to state the basis for these decisions: that "the previous order was issued prematurely based on an insufficient investigatory record for the station-specific conduct at issue." Exs. J, K, L. The agency did not take any analogous action to reopen MAD's proceeding regarding the Fox station.

13

**5.     MAD's Application for Review by the Full Commission**

On February 18, 2025, MAD timely applied to the full Commission to review the bureau-level denial of its petition challenging the Fox station's license renewal. Ex. M.  After that Application had remained pending for more than a year, MAD wrote a letter to the Commission urging it to act.  Ex. N.  The Commission did not respond.  On May 13, 2026, MAD wrote a second letter to the Commission urging it to act.  Ex. O.  Two months have passed since the second letter, and again the Commission has not responded.  MAD's Application has now been pending for seventeen months.

This Petition followed.

**REASONS WHY THE WRIT SHOULD ISSUE**

**I.     THE COURT SHOULD ORDER THE COMMISSION TO ACT ON THE APPLICATION BECAUSE THE AGENCY'S DELAY IS EGREGIOUS**

In *TRAC*, this Court announced six factors it uses to determine whether "an agency's delay is so egregious as to warrant mandamus":

> (1) the time agencies take to make decisions must be governed by a 'rule of reason,' . . . ; (2) where Congress has provided a timetable or other indication of the need with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, . . . ; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; . . . (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, . . . ; (5) the court should also take into account the nature and extent of the interest prejudiced by delay, . . . ; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.''

750 F.2d at 80; *see also In re Center for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022).  Applying these factors, the Court should issue a writ of mandamus requiring the Commission to act promptly on MAD's Application.[12]

---

[12] Factors (2) and (3) are not relevant here, because there is no applicable statutory deadline, and the Communications Act is not a health and safety statute.  We therefore analyze the delay under the other four factors.

15

### A.    The Commission Violated a "Rule of Reason" Prohibiting Disparate Treatment of Similarly-Situated Parties

TRAC factor (1) — application of a "rule of reason" — is the "most important factor" when the Court evaluates unreasonable delay. *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). In administrative law, the paradigmatic rule of reason is the arbitrary and capricious standard, which requires agencies to "engage[ ] in 'reasoned decisionmaking.'" *ACA Int'l v. FCC*, 885 F.3d 687, 695 (D.C. Cir. 2018) (citation omitted). As relevant here, the arbitrary and capricious standard requires an agency to give a reasoned explanation for "treat[ing] similarly situated entities differently." *Lilliputian Systems, Inc. v. Pipeline and Hazardous Materials Safety Administration*, 741 F.3d 1309, 1313 (D.C. Cir. 2014). That is because it is "'black letter administrative law' that 'like cases must receive like treatment.'" *Sinclair Wyoming Ref. Co. v. EPA*, 114 F.4th 693, 724 (D.C. Cir. 2024) (citation omitted).

The Court should apply these "disparate treatment" principles in determining whether the Commission's inaction violated a "rule of reason." In this context, the question is whether the Commission's inaction concerning a Fox station — as compared to its expedited actions concerning ABC, CBS, and NBC stations — violated the "fundamental principle of administrative law that agencies must treat like cases alike." *Grayscale Investments, LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023). The answer is yes.

16

### 1. The Four Proceedings are Similarly Situated

The Commission itself has effectively determined that the challenges to the Fox, ABC, CBS, and NBC stations are similarly-situated agency proceedings, by consolidating all four matters into a single docket; issuing dispositive rulings in all four matters on the same day; and accompanying those rulings with a single statement by the Commission's Chairwoman. Exs. E, F, G, H, I.[13]

In addition, all four proceedings challenge the stations' compliance with their statutory duties under the Communications Act with respect to coverage of election-related matters involving Donald Trump. Three of the four — Fox, ABC, and CBS — involve the same specific statutory provision — namely the "public interest" requirement of 47 U.S.C. § 309(a). The fourth (NBC) involves a separate, more specific statutory mandate that is in many respects a subcomponent of the same public interest requirement.

Furthermore, all four proceedings fall within the same category of agency action as defined in the APA. Specifically, all four involve the agency's adjudication of a request for a "sanction" within the meaning of 5 U.S.C. § 551(10). MAD's petition requests a "withholding of relief" — namely denial of the Fox station's "application" for a license "beneficial" to it. *Id*. §§ 551(10)(B), (11)(C). The

---

[13] In a 2025 letter, Chairman Carr also expressly conceded that the Fox and CBS matters are "like cases" that need to be "treat[ed] . . . alike." Ex. Q at 2.

17

complaints directed at the ABC and CBS stations request "compulsory . . . action" in the form of a reprimand (ABC) and an investigation (CBS).  *Id*. § 551(10)(G). And the complaint directed at the NBC station requests "imposition of a . . . fine." *Id*. § 551(10)(C).

These strong similarities among the proceedings easily bring them within the requirement that they must be "treat[ed] . . . alike." *Grayscale Investments, LLC*, 82 F.4th at 1242.  The matters need not be identical.  They need only "seem similarly situated."  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018); *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 232 (D.C. Cir. 2011) (differential treatment of "seemingly like cases" is arbitrary and capricious). It does not matter that the four matters arose in slightly different procedural contexts.[14]  And the fact that there necessarily are factual differences from case to case does not undermine the reality that the matters are similarly situated.[15]  This Court has found parties similarly situated, and held agencies responsible for arbitrary

---

[14] *See, e.g.*, *Ala. Power Co. v. FCC*, 773 F.2d 362, 370-71 (D.C. Cir. 1985) (FCC acted arbitrarily and capriciously by applying different rate-calculation standards in two different types of agency proceedings without reasoned explanation).

[15] The agency "cannot hide behind the fact-intensive nature" of its determinations to "ignore irrational distinctions between like cases."  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs*., 985 F.3d 472, 480 (5th Cir. 2021).  To the contrary, "'more than an enumeration of factual differences between cases is required'" to treat similar cases differently.  *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 47 (D.C. Cir. 2023) (citation omitted).

18

and capricious disparate treatment, when distinctions between the parties were far greater than they are here.[16]

### 2. The Agency Has Treated MAD's Matter Differently Than the Other Three Matters Without a Rational Basis for Doing So

The agency has treated MAD's matter regarding the Fox station entirely differently than the ABC, CBS, and NBC station matters with which it was consolidated. Commission bureaus denied relief in all four proceedings on January 16, 2025. Just four business days later (on January 22) those same bureaus reopened the ABC, CBS, and NBC proceedings, reversing the prior orders in those matters even though the complainant did not request them to. In stark contrast, the Commission has completely ignored MAD's Application to reverse the bureau order concerning the Fox station. A "reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). But here MAD's Application has languished at the Commission for almost a year and a half. And there is no end in sight for the agency's delay.

---

[16] *See, e.g.*, *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 267, 269 (D.C. Cir. 2014) (utilities in natural gas sector and in electricity sector were similarly situated for ratemaking purposes even though regulated under different statutes and regulations); *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir. 2005) (companies that ship by railway and railway carriers were similarly situated for ratemaking purposes).

The Commission has not given a reasoned explanation for this disparate treatment. The agency has not responded to MAD's letters requesting it to act on MAD's Application (and therefore has not explained to MAD the basis for treating it differently). Exs. N, O. Chairman Carr did respond to a congressional inquiry that questioned the Commission's failure to reopen MAD's Fox matter while reopening the similarly-situated ABC, CBS, and NBC matters. Exs. P at 3 & n.16, Q. But the response was a nonresponse. It said nothing about the ABC and NBC matters and also did not address why the Commission failed to reopen MAD's Fox matter. The response addressed the CBS matter but did so by comparing it to Commission actions in MAD's Fox matter *before* the bureau denied relief; the response did not address the question presented, which is disparate treatment (with respect to reopening) *after* the bureau denied relief. Ex. Q. Furthermore, the one-sentence justifications stated in the CBS, NBC and ABC reopening orders (*see* Exs. J, K, L) are "conclusory statements" that "will not do" — the agency's statement must be "'one of *reasoning*.'" *Amerijet International, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted). Applying a "rule of reason" demanding equivalent treatment of similarly-situated parties, the Court should order the Commission to take prompt action on the Application.

20

**B.    Legitimate Competing Agency Priorities Do Not Provide a Justification for the Disparate Treatment**

Legitimate competing agency priorities (addressed under *TRAC* factor 4) also do not justify the Commission's disparate treatment. The Commission's own statements show that it places an equivalent (and high) priority on the central issues in all four of the matters at issue.

The Commission recently issued a Public Notice reconfirming that the "public interest" requirement is a high priority of the agency. Federal Communications Commission, *FCC Reminds Broadcasters of Their Public Interest Obligations* (DA 26-530), released May 28, 2026, https://www.fcc.gov/document/fcc-reminds-broadcasters-their-public-interest-obligations. The Commission explained that that high-priority obligation includes the following: "character" (i.e., "avoid[ing] conduct that undermines the public trust in the broadcast service"), avoiding "news distortion" and providing "equal opportunity to political candidates." *Id*. at 5 & n.35. Those are the same issues in the Fox ("character"), ABC and CBS ("news distortion") and NBC ("equal opportunity") matters. In addition to discussing those issues at an equivalent level of significance, the Commission stressed the particular importance of "character":

> "The character of an applicant is among the important public interest factors that the Commission considers in determining whether an applicant has the requisite qualifications to become and/or remain a Commission licensee."

21

*Id*. at 5 n.35 (citation omitted).

The Commission unquestionably prioritizes the central public-interest issues in all four proceedings.  Its Public Notice proclaimed that the Commission will engage in "robust" enforcement of the public interest obligation, including with respect to "license renewal applications." *Id*. at 6.  The Commission says it will "not hesitate to exercise its statutory authority to ensure that broadcasters either fulfill their public interest obligation or provide the privilege of being a broadcast licensee to someone who will fulfill that duty." *Id*. at 5-6.  Yet the Commission has failed to act — or even rationally explain its failure to act — in the one related matter that squarely addresses the "character" component of the public interest standard.  The disparate treatment cannot be explained as a matter of differing legitimate priorities of the agency.

> **C.    The Court Need Not Reach the Question Whether the Agency Had an Improper Purpose, But Substantial Contextual Evidence Supports That Concern**

In order to issue a writ of mandamus, the Court need not reach the question whether an improper purpose underlies the Commission's delay.  Under *TRAC* factor (6), the Court "need not find bad faith to find unreasonable delay." *In re Center for Biological Diversity*, 53 F.4th at 672.  However, if a complainant can show that the agency has "singled it out for mistreatment," the case for judicial relief is strong. *Barr Laboratories*, 930 F.2d at 75.  That is because mandamus is warranted when

22

delay is egregious, and "especially shabby treatment of one applicant would seem exactly that." *Id*. Under those circumstances, "the issue of impropriety intersects with [*TRAC* factor] four's sensitivity to the agency's legitimate priorities. Where an agency has manifested bad faith, as by singling someone out for bad treatment . . . the agency will have a hard time claiming legitimacy for its priorities." *Id*. at 76.

What is the explanation for the disparate treatment here, given that the agency has stated no rational basis for it, and the agency's legitimate priorities do not explain it? In answering that question, the Court is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (Roberts, C.J.) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Here the Court can infer, from substantial contextual evidence, that the disparate treatment may stem from the agency's perception of whether the station's network supported — as in the case of Fox — or undermined — as in the case of ABC, CBS, and NBC — the election of President Trump.

MAD's character-based renewal challenge turns on Fox's *conduct* — namely disseminating intentional misrepresentations for financial gain — and does not turn on the substantive *content* of the misrepresentations *per se*. But it is significant here that President Trump vociferously repeated those misrepresentations and appears to

23

have viewed them as a significant factor in his 2020 loss. In social media posts immediately following the 2020 election, President Trump excoriated Dominion for stealing votes from him.[17] President Trump also lauded reports — from Fox — that Dominion had substantially tainted the election.[18] Two and a half years after the election, at around the time MAD filed its petition to deny, President Trump was

---

[17] Donald J. Trump (@realDonaldTrump), X (Nov. 12, 2020, 4:34 PM), https://x.com/realDonaldTrump/status/1326926226888544256?ref_src=twsrc%5Et fw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1326926226888544256%7Ctwgr %5E4e1ed4be67432806af079c28879230fc115c7140%7Ctwcon%5Es1_&ref_url= https%3A%2F%2F ("REPORT: DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN."); Donald J. Trump (@realDonaldTrump), X (Nov. 15, 2020, 12:47 PM), https://x.com/realDonaldTrump/status/1327956491056279552?ref_src=twsrc%5Et fw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1327956491056279552%7Ctwgr %5E4e1ed4be67432806af079c28879230fc115c7140%7Ctwcon%5Es1_&ref_url= https%3A%2F%2F ("He won because the Election was Rigged. NO VOTE WATCHERS OR OBSERVERS allowed, vote tabulated by a Radical Left privately owned company, Dominion, with a bad reputation & bum equipment that couldn't even qualify for Texas (which I won by a lot!), the Fake & Silent Media, & more!").

[18] Donald J. Trump, (@realDonaldTrump), X (Nov. 13, 2020, 3:46 AM), https://x.com/realDonaldTrump/status/1327095398712946695?ref_src=twsrc%5Et fw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1327095398712946695%7Ctwgr %5E4e1ed4be67432806af079c28879230fc115c7140%7Ctwcon%5Es1_&ref_url= https%3A%2F%2F ("Must see @seanhannity takedown of the horrible, inaccurate and anything but secure Dominion Voting System which is used in States where tens of thousands of votes were stolen from us and given to Biden. Likewise, the Great @LouDobbs has a confirming and powerful piece!").

still chastising Dominion.[19]  It is obvious that he would have no incentive to re-ignite

a Commission proceeding that could reconfirm the judicial findings that the

allegations against Dominion were utterly false.

It also is obvious that the President expects the Commission to follow his

supervision and control.  From the beginning of his second term, President Trump

has emphasized that the Commission is not an independent agency and as such must

follow his directives in its regulatory actions.[20]  The current Chairman of the

Commission, Mr. Carr, concurs in that view.[21]  And the Supreme Court's recent

decision in *Trump v. Slaughter*, No. 25-332 (U.S. June 29, 2026) further reinforces

Chairman Carr's dependence on the President's directives.  Under the searching

oversight of the President, there is every reason to believe that Chairman Carr may

---

[19] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL, May 23, 2023, 12:30 PM), https://truthsocial.com/@realDonaldTrump/posts/110418947541791222 ("So Dominion gets almost a Billion Dollars and I, after years of Fake News, Hoaxes, Scams, and Investigations, am entitled to NOTHING? Is that really the way it's supposed to work? I don't think so!").

[20] *See* Exec. Order, Ensuring Accountability for All Agencies (Feb. 18, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/ensuring-accountability-for-all-agencies/ (requiring "so-called 'independent regulatory agencies'" to be "supervised and controlled by the people's elected President").

[21] *See, e.g.*, Ceclia Kang, *F.C.C. Chair Says Agency 'Isn't Independent,' Breaking From Tradition*, N.Y. Times (Dec. 17, 2025), https://www.nytimes.com/2025/12/17/technology/fcc-brendan-carr-senate-hearing.html (quoting Carr as stating as "formally speaking, the F.C.C. isn't independent" and that "I can be fired by the president for no reason or any reason at all.").

25

be avoiding any action that could lead to non-renewal of the Fox license based on the Dominion falsities.

In addition, it is obvious that Mr. Carr — an existing Commissioner who became Chairman on January 20, 2025 — had a strong incentive to expedite proceedings in which the network-owned ABC, CBS, and NBC stations would be sanctioned. Statements by President Trump and Mr. Carr in the period before the 2024 election lodged strong objections to these networks, based on their perceived antipathy toward President Trump's re-election.

In September 2024, President Trump sharply criticized ABC (and said it should lose its licenses) regarding the very same election-debate issues addressed by the ABC station proceeding.[22] In November 2024, Mr. Carr condemned NBC for the very same Saturday Night Live dispute addressed by the NBC station

---

[22] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Sept. 14, 2024, 10:51 AM), https://truthsocial.com/@realDonaldTrump/posts/113136466410544933/ ("ABC FAKE NEWS has been completely discredited, and is now under investigation. Did they give Comrade Kamala the questions? It was 3 on 1, but they were mentally challenged people, against one person of extraordinary genius. It wasn't even close, as is now reflected in the polls. I WON THE DEBATE!"); David Shepardson, *FCC Chair Rejects Trump Call to Pull ABC Licenses Over Presidential Debate*, Reuters (Sept. 19, 2024), https://www.reuters.com/business/media-telecom/fcc-chair-rejects-trump-call-pull-abc-licenses-over-presidential-debate-2024-09-19/ ("Trump claimed the debate was 'rigged' because the ABC News moderators fact checked several comments he made. 'They ought to take away their license for the way they did that,' Trump told Fox News.").

proceeding.[23]   And during the same period, both President Trump and Mr. Carr denounced CBS regarding the 60 Minutes dispute addressed by the CBS station proceeding.  In a social media post, President Trump attached a link to a Fox News article about the specific FCC complaint at issue in this case, adding that "60 MINUTES SHOULD BE IMMEDIATELY TAKEN OFF THE AIR" and that "CBS SHOULD LOSE ITS LICENSE" because "THIS IS THE BIGGEST SCANDAL IN BROADCAST HISTORY."[24]  President Trump then sued CBS for $10 billion in connection with the 60 Minutes dispute.[25]   In November and December 2024, Chairman Carr stated that the 60 Minutes dispute would be considered in connection with the then-pending sale of CBS broadcast licenses from Paramount to Skydance.[26]

---

[23]   Brendan Carr (@BrendanCarrFCC), X (Nov. 3, 2024, 1:35 AM), https://x.com/BrendanCarrFCC/status/1852887210330341693 ("This is a clear and blatant effort to evade the FCC's Equal Time rule.  The purpose of the rule is to avoid exactly this type of biased and partisan conduct - a licensed broadcaster using the public airwaves to exert its influence for one candidate on the eve of an election. Unless the broadcaster offered Equal Time to other qualifying campaigns.").

[24] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL, Oct. 17. 2024, 1:07 PM), https://truthsocial.com/@realDonaldTrump/posts/113323858833174216.

[25] Brittany Bernstein, *Trump Sues CBS Over Harris's 60 Minutes Interview*, National Review, November 1, 2024, https://www.nationalreview.com/news/trump-sues-cbs-over-harriss-60-minutes-interview/.

[26] George Winslow, *FCC's Carr:  CBS News Bias Complaint to Be Part of Paramount Deal Review*, TV Tech (Nov. 20, 2024),

*(footnote continued on next page)*

Furthermore, the timing of events in the ABC, CBS, and NBC matters is quite telling. Two days after the inauguration, the same bureaus that had dismissed the three proceedings that could be perceived as supporting the President reinstated them, while delaying a fourth that could not. That is "especially shabby treatment" justifying a writ of mandamus. *Barr Laboratories, Inc.*, 930 F.2d at 75

### D. The Interests Prejudiced by Delay Justify Relief

The interests prejudiced by delay (addressed in *TRAC* factor 5) also justify relief. The delay prejudices this Court's authority by hiding the ball from it, undermining the Court's ability to conduct meaningful judicial review on important issues concerning the Commission's character requirements. "[T]he statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes . . . ." *TRAC*, 750 F.2d at 76. Delay

---

https://www.tvtechnology.com/news/fccs-carr-cbs-news-bias-complaint-to-be-part-of-paramount-deal-review ("'There's also a news distortion complaint at the FCC still, having to do with CBS, and CBS as a transaction before the FCC,' Carr said in an interview with Fox News Channel. 'And I'm pretty confident that that news distortion complaint over the CBS 60 Minutes transcript is something that's likely to arise in the context of the FCC's review of that transaction.'"); George Winslow, *FCC's Carr Again Highlights CBS 'Bias' Complaint As Factor in Paramount-Skydance Review*, TV Tech (Dec. 19, 2024), https://www.tvtechnology.com/news/fccs-carr-again-highlights-cbs-bias-complaint-as-factor-in-paramount-skydance-review ("Paramount's sale of CBS broadcast licenses to Skydance remains pending before the FCC. This filing from CAR raises what it describes as significant concerns, including ones that go to CBS's adherence to the public interest standard. The FCC will need to address these concerns.").

"'jeopardizes [the Court's] future review of the final [agency] decision' if review may come so late that no effective relief will be available." *Sierra Club v. Thomas*, 828 F.2d 783, 795 (D.C. Cir. 1987). That is why this Court can and should grant mandamus when it concludes that an agency is attempting to "insulate itself from judicial review by refusing to act." *In re Aitken County*, 645 F.3d 428, 436 (D.C. Cir. 2011).

The Commission's delay also prejudices core First Amendment interests. Viewpoint discrimination is an "'egregious form' of content regulation" that violates "'bedrock First Amendment'" interests. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (citations omitted). The foregoing contextual evidence shows a significant risk that the Commission has engaged in viewpoint discrimination by delaying regulatory proceedings against a station it perceives as having supported — and accelerating proceedings against stations it perceives as having undermined — a political viewpoint (namely the desirability of electing President Trump).[27]

---

[27] The Commission, through the Chairwoman's January 16, 2025, statement, has previously charged that all four proceedings threaten First Amendment rights. Ex. I. MAD emphatically disputes that claim with respect to its petition, which challenges the way Fox conducts its business — repeated distribution of undisputedly-false statements to safeguard and enhance company profits — and not the content of speech. In stark contrast to MAD's petition (which relies on well-established Commission policy consistent with the First Amendment), the Commission's inaction on MAD's Application *does* appear to focus on content, by delaying a sanction on a station perceived to support President Trump.

It is significant here that increasing or reducing the pace of the Commission's regulatory process is a potent form of increasing or reducing a broadcast licensee's regulatory burdens. Chief Judge Bazelon explained more than 50 years ago (in terms equally pertinent today) that increasing such burdens allows the Commission to deter dissemination of views it finds objectionable:

> [There is a] pervasive threat [lying] in the sub rosa bureaucratic hassling which the Commission can impose on the licensee, i.e. responding to FCC inquiries, forcing expensive consultation with counsel, immense record-keeping and the various attendant inconveniences. . . . For better or worse, a licensee confronted with the choice between an economic disadvantage and pleasing the government through curtailment of a constitutional right will generally choose curtailment. Thus, licensee political or artistic expression is particularly vulnerable to the 'raised eyebrow' of the FCC; faced with the threat of economic injury, the licensee will choose in many cases to avoid controversial speech in order to forestall that injury. Examples of this process are legion.

*Illinois Citizens Committee for Broadcasting v. FCC*, 515 F.2d 397, 407 (D.C. Cir. 1975). Here discriminating in favor of the Fox station has violated MAD's First Amendment rights, just as discriminating against the ABC, CBS, and NBC stations has violated their First Amendment rights, irreparably harming all of those parties. *See, e.g.*, *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022).

Finally, the Commission's failure to enforce its character policy irreparably harms MAD's members who view the Fox station's broadcasts, by depriving them of their statutory right to receive broadcasts from a licensee whose reliability and

30

truthfulness they can trust.  A broadcaster is public trustee with a fiduciary duty to operate in the public interest.  "The prime beneficiaries of this trusteeship are members of the listening audience[,] [who] are the ones most intimately affected by a licensee's performance of its statutory obligation to operate in the public interest." *Petition for Rulemaking*, Memorandum Opinion and Order, 82 FCC 2d at 101. These viewer beneficiaries are entitled to receive broadcasts from licensees that "avoid conduct that undermines public trust in the broadcast service." *FCC Reminds Broadcasters of Their Public Interest Obligations* (DA 26-530), at 5.  MAD's viewer members have been unable to trust the conduct of the Fox station throughout a substantial portion of its license-renewal period.  By virtue of the agency's delay, the station already has received a *de facto* renewal lasting more than a third of its eight-year license period, with the character issue wholly unresolved.  The Court should order the agency to act on MAD's Application, to end that untenable infringement on the viewers' right to a trustworthy licensee.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD AUTHORIZE MAD TO TAKE DISCOVERY REGARDING THE REASONS FOR DELAY

In the alternative, if the Court decides not to order action on the Application now, it should authorize MAD to take discovery regarding the reasons for the agency's delay.  In doing so, the Court should invoke its previously-recognized authority to order a "special factual inquiry" when a mandamus petition alleges that

an agency has deliberately engaged in disparate treatment. *Barr Laboratories*, 930 F.2d at 75 (citing *TRAC*, 750 F.2d at 78). The Court could then consider discovery from that inquiry in deciding whether to compel the Commission to act.

*TRAC* concluded that this Court's procedures are adequate to remedy unreasonable agency delay, in part because in this context the Court's authority to "take evidence" is equivalent to that of a district court. 750 F.2d at 78. A district court's ability to take evidence in an unreasonable-delay case includes the ability to order discovery. The substantial restrictions on district court discovery that ordinarily apply to other types of APA claims do not apply to unreasonable delay claims under 5 U.S.C. § 706(1).[28] Accordingly, a district court has authority to order

---

[28] The restrictions on discovery in district court APA cases apply when there has been a final agency action, and the court reviews that action based on the administrative record before the agency at the time it made its final decision. By contrast, "when a court considers a claim that an agency has *failed* to act in violation of a legal obligation, 'review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record.'" *San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (citation omitted).

32

discovery into the reasons for an agency's delay.[29]  And the agency cannot block

such discovery by invoking the deliberative process privilege.[30]

Because its factfinding authority is equivalent to that of a district court here,

the Court has the authority to order discovery.  That authority arises under its power,

under the All Writs Act, to issue auxiliary writs necessary to protect its jurisdiction.

*See TRAC*, 750 F.2d at 78 & n.36.  The record in this case plainly warrants discovery

into the reasons for delay if the Court decides not to order immediate action on the

Application.  That "special factual inquiry" can and should proceed under the

auspices of a special master.  *Barr Laboratories*, 930 F.2d at 75; *TRAC*, 750 F.2d at

78.

---

[29] *See, e.g.*, *The Cherokee Nation v. U.S. Dept of the Interior*, 531 F. Supp. 3d 87, 96-98 (D.D.C. 2021); *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dept. of Veterans Affairs*, 842 F. Supp. 2d 127, 130-31 (D.D.C. 2012); *Bodomov v. U.S.*, No. 07-cv-1482, 2007 WL 4373052, *3 (E.D. Pa. Dec. 14, 2007); *Yakubova v. Chertoff*, No. 06-cv-3203, 2006 WL 6589892, *4 (E.D.N.Y. Nov. 2, 2006).

[30] In this case, the Court's role is to "evaluate the pace of the agency *decisional process* and [ ] order expedition if the pace lags unreasonably." *Public Health Citizen Research Group v. Commissioner, Food & Drug Admin*., 740 F.2d 21, 32 (D.C. Cir. 1984) (emphasis added).  When "the 'decision-making process itself is the subject of the litigation,' it is inappropriate to allow the deliberative process privilege to preclude discovery of relevant information." *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003) (quoting *Burka v. NYC Transit Auth*., 110 F.R.D. 660, 667 (S.D.N.Y. 1986)).  There is a "consistent thread of precedents that have pierced the deliberative process privilege when the deliberative process is closely tied to the litigation." *Children First Found., Inc. v. Martinez*, 2007 WL 4344915, *8 (N.D.N.Y. Dec. 10, 2007).

## CONCLUSION

The Court should order the Commission to act promptly on MAD's Application or, in the alternative, authorize MAD to conduct discovery to produce a record that can be used to inform the Court's mandamus decision.

Respectfully submitted,

  /s/ Daniel G. Jarcho
Daniel G. Jarcho
6106 Harvard Avenue
Unit 126
Glen Echo, MD  20812
daniel.jarcho@gmail.com
Phone:  (771) 241-9634

July 14, 2026

Counsel for Petitioner

34

# <u>ADDENDUM</u>

## CERTIFICATE AS TO PARTIES AND AMICI

Pursuant to Circuit Rules 21(d) and 28(a)(1)(A), Petitioner Media and Democracy Project respectfully submits that it and the Federal Communications Commission are the only parties in this Court. Ervin S. Duggan and Alfred Sikes may appear as amici in this Court. There were no district court proceedings, because this is an original proceeding in this Court filed to challenge unreasonable delay in a federal agency proceeding. In the agency proceeding, Petitioner Media and Democracy Project filed a petition challenging renewal of a broadcast license for television station WTXF-TV, and Fox Television Stations, LLC (the licensee of the station) opposed the petition. Numerous members of the public (who were not parties, amici or intervenors) filed comments in the docket of that proceeding.

/s/ Daniel G. Jarcho
Daniel G. Jarcho
Counsel for Petitioner

## RULE 26.1 DISCLOSURE STATEMENT

Petitioner hereby discloses the following pursuant to Fed. R. App. P. 26.1 and Circuit Rules 26.1 and 21(d):

Petitioner Media and Democracy Project has no parent company, and no publicly-held company has a 10% or greater ownership interest in Petitioner.

Petitioner is a non-partisan, volunteer-led, grassroots civic membership association fighting for a more informative and pro-democracy media that operates in the public interest. Petitioner advocates for media reform based on the premise that a well-informed citizenry is the foundation of a democratic society.

/s/ Daniel G. Jarcho
Daniel G. Jarcho
Counsel for Petitioner

## **CERTIFICATE OF COMPLIANCE**

I, Daniel G. Jarcho, counsel for Petitioner, hereby certify that the foregoing Petition complies with the type-volume limitations of Fed. R. App. P. 21(d)(1), because the Petition contains 7,793 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Daniel G. Jarcho
Daniel G. Jarcho

## **CERTIFICATE OF SERVICE**

I, Daniel G. Jarcho, counsel for Petitioner, hereby certify that on July 14, 2026, I caused the foregoing Petition and Exhibits to be served on the following by email to LitigationNotice@fcc.gov and by first class mail:

D. Adam Candeub
General Counsel
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554

Jacob Lewis
Associate General Counsel, Litigation Division
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554

Sarah Citrin
Deputy Associate General Counsel (Appellate)
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554

I further certify that on July 14, 2026, I sent a courtesy copy of the foregoing Petition and Exhibits to Matthew S. DelNero, counsel for Fox Television Stations, LLC, at mdelnero@cov.com.

/s/ Daniel G. Jarcho
Daniel G. Jarcho