ORAL ARGUMENT NOT SCHEDULED

**No. 26-1183**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MEDIA AND DEMOCRACY PROJECT

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Respondent*.

On Petition for Writ of Mandamus to the Federal Communications Commission

# BRIEF OF FORMER FCC CHAIRMAN ALFRED SIKES AND FORMER FCC COMMISSIONER ERVIN DUGGAN AS AMICI CURIAE IN SUPPORT OF PETITIONER (Filed With the Parties' Consent)

John R. Grimm

BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC
7315 Wisconsin Ave.
Suite 800 West
Bethesda, MD 20814
301-656-2707
301-961-6525 (Fax)
jgrimm@bregmanlaw.com

July 21, 2026

*Counsel for Amici Curiae*

## STATEMENT AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties and Amici.** Other than *amici* Alfred Sikes and Ervin Duggan, all parties, intervenors, and *amici* appearing in this Court are listed in the Petitioner's Petition for Writ of Mandamus.

**(B) Rulings Under Review.** The Petition relates to agency action unreasonably withheld. No affirmative ruling is under review.

**(C) Related Cases.** *Amici* are not aware of this case having previously been before this or any other Court and are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## TABLE OF CONTENTS

Table of Authorities .......... iv

Glossary .......... vii

Interest of Amici And Authority to File .......... 1

Introduction .......... 2

Summary of the Argument .......... 3

Argument .......... 5

I. The Commission is Not Operating Properly, and its Inaction on MAD's Application for Review is Part of a Broader Pattern Designed to Evade Judicial Review. .......... 5

II. The Commission's Inaction Denies the Public a Resolution of Vitally Important Matters. .......... 9

A. The Character Requirement for Broadcast Licenses Serves an Important Public Need. .......... 10

B. Broadcaster Integrity Is at its Most Essential When it Comes to Election Coverage .......... 12

Conclusion .......... 15

Certificate of Compliance .......... 16

## TABLE OF AUTHORITIES

### Cases

*Am. Rivers and Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) .................... 9

*Melody Music, Inc. v. FCC*,
345 F.2d 730 (D.C. Cir. 1965) .................... 12

*Nat'l Broad. Co. v. FCC*,
516 F.2d 1101 (D.C. Cir. 1974) .................... 10

*United States v. Munchel*,
991 F.3d 1273 (D.C. Cir. 2021). .................... 13

*US Dominion, Inc. v. Fox News Network,*
*LLC*, 293 A.3d 1002 (Del. Super. Ct. 2023) .................... 11

*W. Va. v. EPA*,
597 U.S. 697 (2022) .................... 7

### Statutes

47 U.S.C. § 154(a) .................... 8

47 U.S.C. § 154(b)(5) .................... 8

47 U.S.C. § 154(h) .................... 8

47 U.S.C. § 307(c)(1) .................... 9

*47 U.S.C. § 308(b) .................... 10

5 U.S.C. § 555(b) .................... 9

52 U.S.C. § 20511 .................... 10

---

* Authorities on which we chiefly rely are marked with asterisks.

**Regulations**


* 47 C.F.R. § 0.5(c) .......... 7

47 C.F.R. § 1.115 .......... 9

47 C.F.R. § 73.1217 .......... 10


**Administrative Materials**


*Application of Melody Music, Inc.*, 2 F.C.C. 2d 958 (1966) .......... 12

*Application of Melody Music, Inc.*, 36 F.C.C. 701 (1964) .......... 12

*Disclosure and Transparency of Artificial Intelligence-Generated Content in Political Advertisements*, MB Docket No. 24-211 (Jul. 25, 2024) .......... 14

*Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 (1949) .......... 14

*In re Complaints Concerning Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C. 2d 650 (1969) .......... 11, 14

*In re Steve Kramer*, 39 FCC Rcd 6004 (2024) .......... 14

Letter from Comm'r, FCC Commissioner Anna Gomez, to Josh D'Amaro, CEO, The Walt Disney Co. (May 11, 2026), .......... 7

* *Policy Regarding Character Qualifications in Broadcast Licensing*, Gen Docket No. 81-500, 102 F.C.C. 2d 1179 (1986) .......... 10

* Statement of Commissioner Gomez on Media Bureau Summary Dismissal of Pet. to Repeal the News Distortion Policy (Jul. 1, 2026) .......... 8

Statement of Commissioner Michael J. Copps on Release of FCC Staff Report "The Technology and Information Needs of Communities," (Jun. 9, 2011) .......... 13

**Other Authorities**

Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Pol'y and the Broad. Hoax Rule*, 24 Comm. L. & Pol'y 1 (2019) ........ 11

John Hendel, *Trump's Threats to Revoke TV Licenses Get Serious*, Politico (Jul. 17, 2026)........ 7

Pet. for Writ of Mandamus, *In re Radio Television Digital News Association*, No. 26-1099 (D.C. Cir. Mar. 26, 2026) ........ 7

Tom Wheeler, *Not "Deregulation" but Heavy-Handed Regulation at the Trump FCC*, Brookings (Feb. 25, 2025) ........ 6

## GLOSSARY

| | |
|---|---|
| AFR | Application for Review |
| APA | Administrative Procedure Act |
| FCC | Federal Communications Commission |
| MAD | Media and Democracy Project |

## INTEREST OF AMICI AND AUTHORITY TO FILE

*Amici* are a former Chairman and a former Commissioner of the Federal Communications Commission, both appointed by President George H.W. Bush. *Amicus* Alfred Sikes served as Republican Chairman from 1989 to 1993, and a*micus* Ervin Duggan served as a Democratic Commissioner from 1990 to 1994. As former members of the FCC, *amici* are strongly interested in ensuring that the Commission follows its policies on broadcaster character in an area as important as misinformation about an election, such as alleged by Petitioner Media and Democracy Project.

No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than *amici* contributed money that was intended to fund preparing or submitting the brief.

Pursuant to D.C. Circuit Rule 29(b), *amici* state that Petitioner Media and Democracy Project and Respondent Federal Communications Commission have consented to the filing of this brief.

## INTRODUCTION

*Amici* know how the FCC is supposed to work. And they know that the Commission's treatment of Petitioner Media and Democracy Project's ("MAD") challenges to WTXF's ("Fox") fitness to hold an FCC broadcast license—which allege Fox spread false information about the 2020 presidential election, contributing to the January 6, 2021 attacks on the U.S. Capitol—is not business as usual.

It seems the FCC has simply refused to consider MAD's application for review of a staff-level order renewing Fox's license, effectively denying the application *sub rosa*. If the Commission stands behind staff's decision, it should have no trouble entering a final agency order that MAD can then appeal. But the FCC's inaction means that, despite the strong evidence MAD has presented that Fox "willfully broadcast[] false news about the 2020 presidential election that contributed to civil unrest in this country, in particular, the events of January 6," (Pet. Ex. A at 1), and despite a judicial determination that there was no truth to Fox's reporting, the decision approving Fox's license renewal remains non-final and thus unreviewable. The Commission should not immunize itself from judicial scrutiny by deferring questions of substantial consequence to

staff. The Court should grant the Petition and require the FCC to rule on MAD's application for review so that MAD can either make its case against Fox before the full Commission, or seek this Court's review of the agency's ruling.

## SUMMARY OF THE ARGUMENT

**I.** The Commission's seventeen-month refusal to consider MAD's application for review is irregular, but unfortunately not surprising. Under Chairman Carr, the Commission has relied heavily on unreviewable staff-level actions, like the bureau order granting Fox's license renewal, to carry out important business that should be left to the full Commission. Meanwhile, two of the five Commissioner seats remain unfilled. The Commission was not intended to work like this. Congress established the FCC as a five-member multipartisan body whose decisions are subject to judicial review. MAD's application for review raises legitimate and important concerns about the staff decision to renew Fox's license, and the Court should instruct the FCC to take final action on that petition.

**II.** The FCC's non-action on MAD's petition is causing real public harm. By allowing Fox to continue broadcasting for nearly a fifth of its

renewal license period despite genuine question over its fitness to hold a broadcast license, the FCC has denied the public the benefit of some of the most important protections the agency's own policies provide.

**a.** The FCC's character requirements for broadcast licensees protect the public and ensure the integrity of the airwaves, which are a public resource. Historically, the Commission has taken seriously the obligation to ensure the trustworthiness of broadcasters. In the rare instances when it has had to take away a station's license for dishonesty, it has done so over conduct much less severe than misleading viewers into doubting the legitimacy of the presidential election result. The Commission's silence in response to MAD's application for review is inconsistent with Commission policy and precedent.

**b.** The agency's inaction is especially troubling—and the Court's intervention is especially necessary—here, because the dishonest conduct MAD alleges against Fox goes against a well-informed electorate which is essential for a democracy to function. The Commission knows this. It has spoken of broadcasters' paramount responsibilities when covering election news, and taken action against scammers making deceptive calls to misinform voters. Its handling of MAD's application for

review belies its own recognition that the public must have reliable information about an election. The Court need not and should not sit by while the Commission abdicates its duties.

## ARGUMENT

### I. THE COMMISSION IS NOT OPERATING PROPERLY, AND ITS INACTION ON MAD'S APPLICATION FOR REVIEW IS PART OF A BROADER PATTERN DESIGNED TO EVADE JUDICIAL REVIEW.

The Commission's failure to meaningfully consider MAD's petition to deny Fox's license renewal, and its refusal for nearly a year and a half to decide MAD's application for review, are part of a troubling pattern where the FCC exerts substantial power through unreviewable staff-level actions at the Chairman's unilateral direction. Here, after the Commission dismissed MAD's opposition to Fox's license renewal and three challenges to other broadcasters' conduct, (*see* Pet. Ex. E, F, G, & H), Chairman Carr hand-picked all but MAD's challenge to revive, based on his personal assessment of their merits, and their perceived alignment with the policies of the administration. (*See* Pet. Ex. J, K, & L.)

Ostensibly, the Commission resuscitated the three non-Fox complaints because they had been dismissed "prematurely based on an insufficient investigatory record," and "require[d] further consideration."

(Pet. Ex. J ¶ 1, K ¶ 1, & L ¶ 1.) If so, that would justify re-opening MAD's petition as well, because all four challenges were dismissed without an investigation. (*See* Pet. Ex. E, F, G, & H.) But unlike MAD's petition, the three that the Commission chose to further consider were filed against broadcasters perceived as unfavorable to the administration. (*See* Pet. at 23.)

This kind of personal intervention by the Chairman is how the Commission now does business. In other instances, Chairman Carr has single-handedly: opened investigations into broadcasters after "unilaterally reach[ing] a conclusion" about their actions "rather than tasking the agency's investigatory authority to independently build a record and recommend a conclusion"; ordered broadcasters to reapply for their licenses after they aired content he disliked; and quashed a petition to revoke the Commission's news-distortion policy—one of the Commission's tools for pressuring broadcasters—by refusing to allow the agency to take the matter up. *See* Tom Wheeler, *Not "Deregulation" but Heavy-Handed Regulation at the Trump FCC*, Brookings (Feb. 25, 2025), https://www.brookings.edu/articles/not-deregulation-but-heavy-handed-regulation-at-the-trump-fcc; Letter from FCC Commissioner Anna

Gomez, to Josh D'Amaro, CEO, The Walt Disney Co. (May 11, 2026), https://docs.fcc.gov/public/attachments/DOC-421580A1.pdf; Pet. for Writ of Mandamus, *In re Radio Television Digital News Association*, No. 26-1099 (D.C. Cir. Mar. 26, 2026), Dkt. No. 2171163. *See also* John Hendel, *Trump's Threats to Revoke TV Licenses Get Serious*, Politico (Jul. 17, 2026), https://www.politico.com/news/2026/07/17/trump-carr-fcc-broadcast-licenses-01003605 ("[C]urrent Chair Brendan Carr has repeatedly opened probes and inquires into the same TV networks that have drawn the president's ire.").

*Amici* know from their own service on the Commission that this is not how the FCC is supposed to operate. Although Commission rules allow staff to "act on matters which are minor or routine or settled in nature," 47 C.F.R. § 0.5(c), MAD's challenge to Fox's license is none of those things.[2] Yet the current Commission relies on staff-level action, and

---

[2] In the context of *congressional* delegations of power to *agencies*, "courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *W. Va. v. EPA*, 597 U.S. 697, 716 (2022) (quotation marks and citation omitted). As a corollary, this Court should not accept an *agency's* delegation of authority to *staff* in areas of vast political significance, like renewing the license of a broadcaster that is credibly accused of propagating misinformation about the results of a presidential election, without a (Continued.)

agency-level *in*action, to do things "that are inconsistent with longstanding Commission precedent [and] that violate both the Communications Act and the First Amendment," while "shield[ing] significant actions from judicial review." Statement of Commissioner Gomez on Media Bureau Summary Dismissal of Pet. to Repeal the News Distortion Pol'y (Jul. 1, 2026), https://docs.fcc.gov/public/attachments/DOC-422758A1.pdf. Meanwhile, instead of acting as the five-member multi-partisan body Congress intended it to be, the Commission today operates with a bare quorum of three. *See* 47 U.S.C. § 154(a), (b)(5), (h) (establishing number and qualifications of commissioners and quorum requirement).

The Commission's strategic avoidance of regulating through judicially reviewable actions is extraordinary and justifies the extraordinary remedy of mandamus. "Under the APA a federal agency is obligated to conclude a matter presented to it within a reasonable time," and an agency's suggestion "that it is not obligated to address a petition filed under one of its own regulations" is "without merit." *In re Am. Rivers*

clear indication that both Congress and the agency intended that delegation.

*and Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (citing 5 U.S.C. § 555(b) (quotation marks omitted)). MAD's application for review was properly filed under established Commission procedural rules, *see* 47 C.F.R. § 1.115, and the Court should require the Commission to take final action on it.

What's more, prompt judicial intervention is especially crucial here, because MAD's challenge to Fox's license raises concerns of overwhelming public importance, and the Commission's inert response is incompatible with the public interest.

## II. THE COMMISSION'S INACTION DENIES THE PUBLIC A RESOLUTION OF VITALLY IMPORTANT MATTERS.

The Commission's refusal to take up MAD's application for review has allowed Fox to continue operating for nearly a fifth of its license period, *see* 47 U.S.C. § 307(c)(1) (providing for eight-year license terms), without credible claims of Fox's untruthfulness receiving meaningful scrutiny by the full FCC. This harms the public because FCC character requirements are designed to protect the public interest, and the public interest is never higher than when it comes to trustworthy news coverage of a presidential election.

### A. The Character Requirement for Broadcast Licenses Serves an Important Public Need.

Congress requires the Commission to ensure the good character of broadcasters. *See* 47 U.S.C. § 308(b). This requirement is important because the airwaves are "a public resource in which every citizen has an interest." *Nat'l Broad. Co. v. FCC*, 516 F.2d 1101, 1191 (D.C. Cir. 1974). The Commission knows this well, having long ago remarked that "the trait of 'truthfulness' is one of two key elements of character necessary to operate a broadcast station in the public interest," and stressed its authority "to treat even the most insignificant misrepresentation as disqualifying." *Pol'y Regarding Character Qualifications in Broad. Licensing*, Gen Docket No. 81-500, 102 F.C.C. 2d 1179 ¶ 60 (1986). Likewise the Commission's rules flatly prohibit broadcasters from knowingly broadcasting "false information concerning a crime or catastrophe"—which, of course, would include election tampering, *see* 52 U.S.C. § 20511—when the broadcast directly and foreseeably causes public harm. 47 C.F.R. § 73.1217.

Despite the requirement for broadcaster honesty being firmly embedded in FCC policy, the Commission is completely ignoring MAD's application for review. This is remarkable, because MAD's position is

supported not just by compelling evidence, but by a *judicial determination* that it was "***CRYSTAL** clear that none of the statements*" Fox made "*relating to Dominion about the 2020 election are true.*" *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023) (emphasis in original).

In the past, the Commission has taken seriously its obligation to protect the public from dishonest broadcasters, recognizing that intentional news distortion "amounts to a fraud upon the public and is patently inconsistent with the licensee's obligation to operate [its] facilities in the public interest." *In re Complaints Concerning Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C. 2d 650, 657 (1969). And although it has only rarely had to resort to revoking a license due to a broadcaster's dishonesty, it has done so over broadcasters' "deceptive radio station promotions," "conducting fraudulent contests," and rigging a quiz show. Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Pol'y and the Broad. Hoax Rule*, 24 Comm. L. & Pol'y 1, 19 (2019); *In re Application of Melody Music, Inc.*, 36

F.C.C. 701 (1964).[3] And while each of those stations committed other violations along with their dishonest conduct, their dishonesty involved affairs that seem trivial compared to news coverage of presidential election results. The Commission should adhere to its past practice and examine Fox's fitness to hold a broadcast license.

It is hard to imagine a situation calling more for Commission oversight than when a broadcaster misrepresents the legitimacy of a presidential election. In tolerating Fox's alleged dishonesty, the Commission turns a blind eye toward a major threat to the well-informed electorate that is vital in a democracy.

### B. Broadcaster Integrity Is at its Most Essential When it Comes to Election Coverage.

MAD's allegations against Fox are particularly demanding of FCC action because providing voters with honest information about a presidential election is absolutely essential to a functioning democracy.

---

[3] This Court reversed the FCC's revocation order in *Melody Music*, finding that the Commission had not adequately explained its reasoning. *Melody Music, Inc. v. FCC*, 345 F.2d 730 (D.C. Cir. 1965). On remand, the Commission allowed the station to renew its license for a year, but required its owner to divest itself of "all its broadcast ownership interests . . . ." *Application of Melody Music, Inc.*, 2 F.C.C. 2d 958 ¶ 14 (1966).

MAD charges that Fox did the opposite, fomenting distrust in the results of the 2020 election which "significantly contributed to the January 6, 2021, storming of the Capitol building and its terrible and lasting consequences for this country." (Pet. Ex. A at 2.)

Surely any agency's responsibility to the public is at its apex when dishonest conduct undermines confidence in an election and helps spur to what this Court has called a "violent breach of the Capitol on" which, "[i]t cannot be gainsaid," "was a grave danger to our democracy[.]" *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). As then-Commissioner Copps put it in 2011, "[a] well-informed electorate is the premise and prerequisite of functioning self-government," and "it is imperative that the FCC play a vital role" in ensuring Americans' access to information about important public issues. Statement of Commissioner Michael J. Copps on Release of FCC Staff Report "The Technology and Information Needs of Communities," 2011 WL 2286922, at *1 (Jun. 9, 2011).

Aware of the importance of an informed electorate, the Commission has recognized the need for truthful information about an election. The Commission once warned that when news coverage "set[s] the stage for

the presidential campaigns and election," broadcasters' "influence must carry with it the highest responsibilities for intellectual integrity and independence," and deemed it "axiomatic that one of the most vital questions of mass communication in a democracy is the development of an informed public opinion through the public dissemination of news and ideas concerning the vital public issues of the day." *Democratic Nat'l Convention*, 16 F.C.C. 2d at 650, 656; *Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 ¶ 6 (1949). More recently, the Commission has raised concerns about political ads generated by artificial intelligence, which "could mislead the public about the candidates' assertions or positions," or "produce convincingly false messages about where or when to cast a ballot . . . ." Notice of Proposed Rulemaking ¶ 9, *Disclosure and Transparency of Artificial Intelligence-Generated Content in Political Advertisements*, MB Docket No. 24-211 (Jul. 25, 2024). And the Commission has levied multimillion-dollar fines against robocallers placing misleading calls urging people not to vote in a primary election. *In re Steve Kramer*, 39 FCC Rcd 6004 (2024).

The Commission's sustained inactivity toward MAD's application for review flies in the face of its policies against dishonesty in election

communications. MAD's application for review raises concerns that are critically important, and the Commission's refusal to even consider that application requires this Court to swiftly intercede.

## CONCLUSION

The Court should grant the Petition for Writ of Mandamus.

July 21, 2026

Respectfully submitted,

/s/ *John R. Grimm*
John R. Grimm
BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC
7315 Wisconsin Ave.
Suite 800 West
Bethesda, MD 20814
301-656-2707
301-961-6525 (Fax)
jgrimm@bregmanlaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with [the type-volume limit of Fed. R. App. P. 29(a)(5) & 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,679 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook.

July 21, 2026

/s/ *John R. Grimm*
John R. Grimm

*Counsel for Amici Curiae*

## STATUTORY ADDENDUM

# STATUTORY ADDENDUM CONTENTS

47 U.S.C. § 154 .......... Add. 1

47 U.S.C. § 307 .......... Add. 3

47 U.S.C. § 308 .......... Add. 6

52 U.S.C. § 20511 .......... Add. 8

47 C.F.R. § 0.5 .......... Add. 9

47 C.F.R. § 1.115 .......... Add. 11

47 C.F.R. § 73.1217 .......... Add. 16

**47 U.S.C. § 154**

§ 154. Federal Communications Commission

**(a) Number of commissioners; appointment**

The Federal Communications Commission (in this chapter referred to as the "Commission") shall be composed of five commissioners appointed by the President, by and with the advice and consent of the Senate, one of whom the President shall designate as chairman.

* * *

**(h) Quorum; seal**

Three members of the Commission shall constitute a quorum thereof. The Commission shall have an official seal which shall be judicially noticed.

**(i) Duties and powers**

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

**(j) Conduct of proceedings; hearings**

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested. The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.

**(k) Record of reports**

All reports of investigations made by the Commission shall be entered of record, and a copy thereof shall be furnished to the party who may have

complained, and to any common carrier or licensee that may have been complained of.

**(l) Publication of reports; admissibility as evidence**

The Commission shall provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and such authorized publications shall be competent evidence of the reports and decisions of the Commission therein contained in all courts of the United States and of the several States without any further proof or authentication thereof.

**(m) Compensation of appointees**

Rates of compensation of persons appointed under this section shall be subject to the reduction applicable to officers and employees of the Federal Government generally.

**(n) Use of communications in safety of life and property**

For the purpose of obtaining maximum effectiveness from the use of radio and wire communications in connection with safety of life and property, the Commission shall investigate and study all phases of the problem and the best methods of obtaining the cooperation and coordination of these systems.

**47 U.S.C. § 307**

§ 307. Licenses

**(a) Grant**

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

**(b) Allocation of facilities**

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

**(c) Terms of licenses**

**(1) Initial and renewal licenses**

Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby. Consistent with the foregoing provisions of this subsection, the Commission may by rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action.

**(2) Materials in application**

In order to expedite action on applications for renewal of broadcasting station licenses and in order to avoid needless expense to applicants for

such renewals, the Commission shall not require any such applicant to file any information which previously has been furnished to the Commission or which is not directly material to the considerations that affect the granting or denial of such application, but the Commission may require any new or additional facts it deems necessary to make its findings.

**(3) Continuation pending decision**

Pending any administrative or judicial hearing and final decision on such an application and the disposition of any petition for rehearing pursuant to section 405 or section 402 of this title, the Commission shall continue such license in effect.

**(d) Renewals**

No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

**(e) Operation of certain radio stations without individual licenses**

**(1)** Notwithstanding any license requirement established in this chapter, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

**(2)** Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this chapter and with rules prescribed by the Commission under this chapter.

**(3)** For purposes of this subsection, the terms “citizens band radio service”, “radio control service”, “aircraft station” and “ship station” shall have the meanings given them by the Commission by rule.

**(f) Areas in Alaska without access to over the air broadcasts**

Notwithstanding any other provision of law, (1) any holder of a broadcast license may broadcast to an area of Alaska that otherwise does not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery even if another holder of a broadcast license begins broadcasting to such area, (2) any holder of a broadcast license who has broadcast to an area of Alaska that did not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery may continue providing such service even if another holder of a broadcast license begins broadcasting to such area, and shall not be fined or subject to any other penalty, forfeiture, or revocation related to providing such service including any fine, penalty, forfeiture, or revocation for continuing to operate notwithstanding orders to the contrary.

## 47 U.S.C. § 308

§ 308. Requirements for license

### (a) Writing; exceptions

The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided*, That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

### (b) Conditions

All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to

be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee in any manner or form, including by electronic means, as the Commission may prescribe by regulation.

**(c) Commercial communication**

The Commission in granting any license for a station intended or used for commercial communication between the United States or any Territory or possession, continental or insular, subject to the jurisdiction of the United States, and any foreign country, may impose any terms, conditions, or restrictions authorized to be imposed with respect to submarine-cable licenses by section 35 of this title.

**(d) Summary of complaints**

Each applicant for the renewal of a commercial or noncommercial television license shall attach as an exhibit to the application a summary of written comments and suggestions received from the public and maintained by the licensee (in accordance with Commission regulations) that comment on the applicant's programming, if any, and that are characterized by the commentor as constituting violent programming.

## 52 U.S.C. § 20511

§ 20511. Criminal penalties

A person, including an election official, who in any election for Federal office—

**(1)** knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for—

**(A)** registering to vote, or voting, or attempting to register or vote;

**(B)** urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

**(C)** exercising any right under this chapter; or

**(2)** knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by—

**(A)** the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or

**(B)** the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held,

shall be fined in accordance with Title 18 (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of Title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.

## 47 C.F.R. § 0.5

§ 0.5 General description of Commission organization and operations.

* * *

(b) Staff responsibilities and functions. The organization and functions of these major staff units are described in detail in §§ 0.11 through 0.151. The defense and emergency preparedness functions of the Commission are set forth separately, beginning at § 0.181. For a complete description of staff functions, reference should be made to those provisions. (See also the U.S. Government Organization Manual, which contains a chart showing the Commission's organization, the names of the members and principal staff officers of the Commission, and other information concerning the Commission.)

(c) Delegations of authority to the staff. Pursuant to section 5(c) of the Communications Act, the Commission has delegated authority to its staff to act on matters which are minor or routine or settled in nature and those in which immediate action may be necessary. See subpart B of this part. Actions taken under delegated authority are subject to review by the Commission, on its own motion or on an application for review filed by a person aggrieved by the action. Except for the possibility of review, actions taken under delegated authority have the same force and effect as actions taken by the Commission. The delegation of authority to a staff officer, however, does not mean that the staff officer will exercise that authority in all matters subject to the delegation. The staff is at liberty to refer any matter at any stage to the Commission for action, upon concluding that it involves matters warranting the Commission's consideration, and the Commission may instruct the staff to do so.

(d) Commission action. Matters requiring Commission action, or warranting its consideration, are dealt with by the Commission at regular monthly meetings, or at special meetings called to consider a particular matter. Meetings are normally held at the principal offices of the Commission in the District of Columbia, but may be held elsewhere in the United States. In appropriate circumstances, Commission action may be taken between meetings "by circulation", which involves the submission of a document to each of the Commissioners for his approval.

(e) Compliance with Federal financial management requirements. Any Bureau or Office recommending Commission action that may affect agency compliance with Federal financial management requirements must confer with the Office of Managing Director. Such items will indicate the position of the Managing Director when forwarded to the Commission. Any Bureau or Office taking action under delegated authority that may affect agency compliance with Federal financial management requirements must confer with the Office of the Managing Director before taking action.

## 47 C.F.R. § 1.115

§ 1.115 Application for review of action taken pursuant to delegated authority.

(a) Any person aggrieved by any action taken pursuant to delegated authority may file an application requesting review of that action by the Commission. Any person filing an application for review who has not previously participated in the proceeding shall include with his application a statement describing with particularity the manner in which he is aggrieved by the action taken and showing good reason why it was not possible for him to participate in the earlier stages of the proceeding. Any application for review which fails to make an adequate showing in this respect will be dismissed.

(b)(1) The application for review shall concisely and plainly state the questions presented for review with reference, where appropriate, to the findings of fact or conclusions of law.

(2) The application for review shall specify with particularity, from among the following, the factor(s) which warrant Commission consideration of the questions presented:

(i) The action taken pursuant to delegated authority is in conflict with statute, regulation, case precedent, or established Commission policy.

(ii) The action involves a question of law or policy which has not previously been resolved by the Commission.

(iii) The action involves application of a precedent or policy which should be overturned or revised.

(iv) An erroneous finding as to an important or material question of fact.

(v) Prejudicial procedural error.

(3) The application for review shall state with particularity the respects in which the action taken by the designated authority should be changed.

(4) The application for review shall state the form of relief sought and, subject to this requirement, may contain alternative requests.

(c) No application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass.

Note: Subject to the requirements of § 1.106, new questions of fact or law may be presented to the designated authority in a petition for reconsideration.

(d) Except as provided in paragraph (e) of this section and in § 0.461(j) of this chapter, the application for review and any supplemental thereto shall be filed within 30 days of public notice of such action, as that date is defined in § 1.4(b). Opposition to the application shall be filed within 15 days after the application for review is filed. Except as provided in paragraph (e)(1) of this section, replies to oppositions shall be filed within 10 days after the opposition is filed and shall be limited to matters raised in the opposition.

(e)(1) Applications for review of an order designating a matter for hearing that was issued under delegated authority shall be deferred until exceptions to the initial decision in the case are filed, unless the presiding officer certifies such an application for review to the Commission. A matter shall be certified to the Commission if the presiding officer determines that the matter involves a controlling question of law as to which there is substantial ground for difference of opinion and that immediate consideration of the question would materially expedite the ultimate resolution of the litigation. A request to certify a matter to the Commission shall be filed with the presiding officer within 5 days after the designation order is released. A ruling refusing to certify a matter to the Commission is not appealable. Any application for review authorized by the presiding officer shall be filed within 5 days after the order certifying the matter to the Commission is released or such a ruling is made. Oppositions shall be filed within 5 days after the application for review is filed. Replies to oppositions shall be filed only if they are requested by the Commission. Replies (if allowed) shall be filed within 5 days after they are requested. The Commission may dismiss, without stating reasons, an application for review that has been certified, and

direct that the objections to the order designating the matter for hearing be deferred and raised when exceptions in the initial decision in the case are filed.

(2) Applications for review of final staff decisions issued on delegated authority in formal complaint proceedings on the Enforcement Bureau's Accelerated Docket (see, e.g., § 1.730) shall be filed within 15 days of public notice of the decision, as that date is defined in § 1.4(b). These applications for review oppositions and replies in Accelerated Docket proceedings shall be served on parties to the proceeding by hand or facsimile transmission.

(f) Applications for review, oppositions, and replies shall conform to the requirements of §§ 1.49, 1.51, and 1.52, and shall be submitted to the Secretary, Federal Communications Commission, Washington, DC 20554. Except as provided below, applications for review and oppositions thereto shall not exceed 25 double-space typewritten pages. Applications for review of interlocutory actions in hearing proceedings (including designation orders) and oppositions thereto shall not exceed 5 double-spaced typewritten pages. When permitted (see paragraph (e)(1) of this section), reply pleadings shall not exceed 5 double-spaced typewritten pages. The application for review shall be served upon the parties to the proceeding. Oppositions to the application for review shall be served on the person seeking review and on parties to the proceeding. When permitted (see paragraph (e)(1) of this section), replies to the opposition(s) to the application for review shall be served on the person(s) opposing the application for review and on parties to the proceeding.

(g) The Commission may grant the application for review in whole or in part, or it may deny the application with or without specifying reasons therefor. A petition requesting reconsideration of a ruling which denies an application for review will be entertained only if one or more of the following circumstances is present:

(1) The petition relies on facts which related to events which have occurred or circumstances which have changed since the last opportunity to present such matters; or

(2) The petition relies on facts unknown to petitioner until after his last opportunity to present such matters which could not, through the exercise of ordinary diligence, have been learned prior to such opportunity.

(h)(1) If the Commission grants the application for review in whole or in part, it may, in its decision:

(i) Simultaneously reverse or modify the order from which review is sought;

(ii) Remand the matter to the designated authority for reconsideration in accordance with its instructions, and, if an evidentiary hearing has been held, the remand may be to the person(s) who conducted the hearing; or

(iii) Order such other proceedings, including briefs and oral argument, as may be necessary or appropriate.

(2) In the event the Commission orders further proceedings, it may stay the effect of the order from which review is sought. (See § 1.102.) Following the completion of such further proceedings the Commission may affirm, reverse or modify the order from which review is sought, or it may set aside the order and remand the matter to the designated authority for reconsideration in accordance with its instructions. If an evidentiary hearing has been held, the Commission may remand the matter to the person(s) who conducted the hearing for rehearing on such issues and in accordance with such instructions as may be appropriate.

Note: For purposes of this section, the word "order" refers to that portion of its action wherein the Commission announces its judgment. This should be distinguished from the "memorandum opinion" or other material which often accompany and explain the order.

(i) An order of the Commission which reverses or modifies the action taken pursuant to delegated authority is subject to the same provisions with respect to reconsideration as an original order of the Commission. In no event, however, shall a ruling which denies an application for

review be considered a modification of the action taken pursuant to delegated authority.

(j) No evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission believes should have been taken in the original proceeding shall be taken on any rehearing ordered pursuant to the provisions of this section.

**47 C.F.R. § 73.1217**

§ 73.1217 Broadcast hoaxes.

(a) No licensee or permittee of any broadcast station shall broadcast false information concerning a crime or a catastrophe if:

(1) The licensee knows this information is false;

(2) It is foreseeable that broadcast of the information will cause substantial public harm, and

(3) Broadcast of the information does in fact directly cause substantial public harm.

(b) Any programming accompanied by a disclaimer will be presumed not to pose foreseeable harm if the disclaimer clearly characterizes the program as a fiction and is presented in a way that is reasonable under the circumstances.

(c) For purposes of this rule, "public harm" must begin immediately, and cause direct and actual damage to property or to the health or safety of the general public, or diversion of law enforcement or other public health and safety authorities from their duties. The public harm will be deemed foreseeable if the licensee could expect with a significant degree of certainty that public harm would occur. A "crime" is any act or omission that makes the offender subject to criminal punishment by law. A "catastrophe" is a disaster or imminent disaster involving violent or sudden event affecting the public.