**No. 26-1183**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

IN RE MEDIA AND DEMOCRACY PROJECT,
*Petitioner*.

---

**OPPOSITION OF FEDERAL COMMUNICATIONS COMMISSION
TO PETITION FOR WRIT OF MANDAMUS**

---

The Federal Communications Commission (FCC or Commission) opposes the petition for a writ of mandamus filed by Media and Democracy Project (MAD).

Mandamus is a "'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259-60 (1947)). MAD has not come close to showing that this case warrants that drastic remedy. In light of the number and complexity of the issues raised by MAD's application for review, and the other equally or more important priorities competing for the agency's attention, the time the FCC has taken to consider MAD's application for review falls far short of the "egregious" delay required to justify mandamus. *In re Monroe*

*Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988); *see Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) (*TRAC*). The Court thus should deny the petition.

## BACKGROUND

### A. Statutory and Regulatory Framework

The Communications Act of 1934, as amended (Act), establishes a system for licensing the use of radio spectrum and authorizes the FCC to grant radio licenses, including for broadcast television stations. 47 U.S.C. § 301. Under section 309(k)(1) of the Act, the FCC must grant a broadcast television station's license renewal application "if it finds, with respect to that station, during the preceding term of its license":

> (A) the station has served the public interest, convenience, and necessity;
>
> (B) there have been no serious violations by the licensee of [the Communications Act] or the rules and regulations of the Commission; and
>
> (C) there have been no other violations by the licensee of [the Communications Act] or the rules and regulations of the Commission which, taken together, would constitute a pattern of abuse.

*Id.* § 309(k)(1).

Section 308(b) of the Act states that the FCC should consider, among other things, the applicant's "character" in granting or denying a license renewal application. *Id.* § 308(b). In examining an applicant's character, the Commission reviews the applicant's conduct, including in particular "misconduct which violates the Communications Act or a Commission rule or policy." *Policy Regarding Character Qualifications in Broadcast Licensing*, Report, Order and Policy Statement, 102 F.C.C.2d 1179, 1190 ¶ 23 (1986) (*1986 Character Policy Statement*). The Commission also takes account, however, of "certain specified non-FCC misconduct which demonstrate[s] the proclivity of an applicant to deal truthfully with the Commission and to comply with [the agency's] rules and policies." *Id.* at 1190-91 ¶ 23.

The Commission has established four specific categories of non-FCC-related conduct that may bear on the applicant's character to hold a broadcast license: (1) "adjudications of both criminal and civil violations of law . . . in which a specific finding of fraudulent representation to another governmental unit is made," *id.* at 1196 ¶ 36; (2) "criminal convictions involving false statement or dishonesty," *id.* at 1196 ¶ 37; (3) "adjudications involving antitrust or anticompetitive

violations from a court of competent jurisdiction, the Federal Trade Commission, or other governmental unit charged with the responsibility of policing such activity," *id.* at 1202 ¶ 44; and (4) "any conviction for misconduct constituting a felony," *Policy Regarding Character Qualifications in Broadcast Licensing*, Policy Statement and Order, 5 FCC Rcd. 3252, 3252 ¶ 4 (1990).

"Any party in interest" may file a petition to deny with the FCC that contains "specific allegations of fact sufficient to show that . . . a grant of the application would be prima facie inconsistent with" section 309(k) of the Act. 47 U.S.C. § 309(d)(1); *see* 47 C.F.R. § 73.3584. If the FCC finds that the record presents "a substantial and material question of fact," or if it is unable to find that the licensee has met the statutory renewal standard, it must "formally designate the application for hearing." 47 U.S.C. § 309(e), *see also id.* § 309(d)(2). If the FCC finds that the record does not present any substantial and material questions of fact and that the licensee has met the statutory renewal standard, the FCC must grant the application. *See id.* § 309(d)(2); *see also id.* § 309(k)(1).

### B. License Renewal Application and Petition to Deny

On April 3, 2023, Fox Television Stations, LLC (Fox Television) filed an application to renew the license of WTXF-TV, Philadelphia, PA. Application for Renewal of License of WTXF-TV, LMS File No. 0000213362 (filed Apr. 3, 2023), https://perma.cc/EXW7-JASV.

On July 3, 2023, MAD and certain of its members (Petitioners) filed a petition to deny the license renewal application. Pet. Ex. A. The Petitioners alleged that Fox Television and its parent company, Fox Corporation, "intentionally manipulated [their] audience" and questioned whether they have "operated [their] stations in the public interest," have "violated Commission policies," and have "the requisite character to remain an FCC licensee." *Id.* at 9. The Petitioners requested an evidentiary hearing to determine the extent of the willful misrepresentation of the news and whether that non-FCC-related conduct "disqualifies" Fox Television and its parent company, Fox Corporation, from being FCC licensees. *Id.* at 9-10.

In doing so, the Petitioners relied upon a March 31, 2023 Delaware Superior Court decision in a civil defamation suit against Fox Corporation and Fox News Network, LLC (Fox News)—a cable network

under common control with Fox Television, the licensee of WTXF—that was filed by Dominion Voting Systems, Inc., and related entities (Dominion). *See id.* at 2-3, 4-6, 7, 9, 11, 13, 14, 15; *see also* Pet. Ex. A, Ex. 1, at 2. In that decision, the Delaware court concluded that Fox News had disseminated false statements relating to Dominion about the 2020 presidential election. Pet. Ex. A, Ex. 1, at 43, 48. The parties subsequently settled the matter. Pet. Ex. A, at 3.

While the petition to deny was pending, the Center for American Rights filed complaints with the FCC against three other broadcast television stations, each owned by a different network: (1) a complaint against an ABC station (WPVI) alleging that it had engaged in news distortion during its carriage of the presidential debate of September 10, 2024, Pet. Ex. B; (2) a complaint against a CBS station (WCBS) alleging that it had engaged in news distortion in connection with a *60 Minutes* interview of then-Vice President Kamala Harris, Pet. Ex. C; and (3) a complaint against an NBC station (WNBC) alleging a violation of the FCC's "equal time" rule after Vice President Harris and Senator Tim Kaine had appeared on Saturday Night Live, Pet. Ex. D.

### C. The Media Bureau Order

On January 16, 2025, the FCC's Media Bureau, acting on authority delegated from the Commission, *see* 47 C.F.R. §§ 0.61(a), 0.283, granted WTXF's license renewal application after finding that the petition to deny did not set forth "'specific allegations of fact sufficient to show that . . . a grant of the [renewal] application would be prima facie inconsistent with' Section 309(k) of the Act." *Preserving the First Amendment; Application of Fox Television Stations, LLC for Renewal of License of WTXF-TV, Philadelphia, PA*, Memorandum Opinion and Order, 40 FCC Rcd. 438 (MB 2025), Pet. Ex. E, at 5 ¶ 10.

The Bureau concluded that, in relevant part, "none of the conduct alleged by the Petitioners . . . involve [WTXF]," and thus the Petitioners "have not raised issues pertinent to review of a renewal application under Section 309(k)." *Id.* at 6 ¶ 13. The Bureau noted that the Petitioners had relied on the Delaware state court's finding that a cable network under common control with WTXF had "disseminated false statements relating to the 2020 Presidential election." *Id.* It explained, however, that "[n]either [WTXF] nor the Licensee [Fox Television] was a defendant in that lawsuit, and the state court decision made no

findings [regarding] or even mentioned the Licensee or [WTXF]." *Id.* The Bureau also found that the Petitioners failed to establish a prima facie case of news distortion by WTXF because they never alleged "anything that might support a claim that the false statements disseminated on Fox News were broadcast on WTXF-TV." *Id.* at 6 ¶ 14.

As an alternative and independent basis for denying the petition, the Bureau found that the Petitioners had failed to establish a prima facie case that Fox Television had a disqualifying character issue. *Id.* at 7-9 ¶¶ 17-19. The Bureau acknowledged that certain adjudicated non-FCC-related conduct is relevant to determining whether a broadcast applicant has the requisite character to be a licensee. *Id.* at 7-8 ¶ 17. It found the Petitioners' allegations insufficient, however, because (1) "the state court's determination in a civil defamation matter that a cable network under common control with the Licensee [Fox Television] disseminated false statements does not fall within any of the categories of relevant non-FCC-related misconduct [under FCC precedent]"; and (2) the state court did not reach an "ultimate adjudication" on "actual malice" or on whether Fox Television's parent company (Fox Corporation) had published the false statements. *Id.* at 8 ¶ 18. The

Bureau also found that the Petitioners had failed to address how the unadjudicated non-FCC-related conduct was "so egregious as to shock the conscience and evoke almost universal disapprobation" that it should disqualify Fox Television from holding an FCC license. *Id.* at 9 ¶ 19 (quoting *1986 Character Policy Statement*, 102 F.C.C.2d at 1204-05 ¶ 48 n.60).

On the same day, the FCC denied the three complaints filed by the Center for American Rights against WPVI, WCBS, and WNBC. Pet. Exs. F, G, H. The denials explained that the complaints against WPVI and WCBS failed to meet the "high threshold" for opening a news distortion investigation, Pet. Ex. F, at 2, 3; Pet. Ex. G, at 3-4, and that WNBC had "prompt[ly] respon[ded] to the equal opportunities requests from the candidates in a manner consistent with [the] rules," Pet. Ex. H, at 4 ¶ 12.

On January 22, after a change in Commission leadership following the transition in presidential administrations, the complaints against WPVI, WCBS, and WNBC were reinstated. Pet. Ex. J (WPVI); Pet. Ex. K (WCBS); Pet. Ex. L (WNBC). The reinstatement orders explained that the prior denials had been "issued prematurely based on an

insufficient investigatory record for the station-specific conduct at issue." Pet. Ex. J, at 1 ¶ 1; Pet. Ex. K, at 1 ¶ 1; Pet. Ex. L, at 1 ¶ 1.

### D. MAD's Application for Review

On February 18, 2025, MAD filed an application for review of the Media Bureau's order denying MAD's petition to deny. Pet. Ex. M. Among other things, MAD claims "that non-FCC related conduct bearing on Fox's character, whether or not it was at the station, is relevant to the public interest standard the Commission is obligated to apply in a renewal proceeding." *Id.* at 7; *see also id.* at 14. MAD's application for review remains pending.

### E. MAD's Mandamus Petition

On July 14, 2026, MAD filed a petition for a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a), asking the Court to "order the Commission to act promptly on MAD's Application [for Review] or, in the alternative, authorize MAD to conduct discovery to produce a record that can be used to inform the Court's mandamus decision." Pet. 34. On October 6, 2026, this Court ordered the Commission to file a response to MAD's petition for mandamus by November 5, 2026.

## ARGUMENT

### I. MANDAMUS IS UNWARRANTED BECAUSE MAD HAS NOT SHOWN THAT THE COMMISSION'S DELAY IS EGREGIOUS.

A writ of mandamus is a "'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney*, 542 U.S. at 380 (quoting *Ex parte Fahey*, 332 U.S. at 259-60). In seeking mandamus, a petitioner must show that "no other adequate means [exist] to attain the relief [it] desires" and that "[its] right to issuance of the writ is clear and indisputable." *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (per curiam) (quoting *Cheney*, 542 U.S. at 380-81). Even when a petitioner makes this stringent showing, a court must find "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381; *see In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) ("[A] court may grant mandamus relief only when it also finds compelling equitable grounds." (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005))).

In cases seeking to remedy alleged agency delay, "[t]he central question . . . is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir.

2008) (quoting *TRAC*, 750 F.2d at 79). This Court assesses the egregiousness of agency delay under a six-factor standard:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 80 (citations omitted). "No one factor is determinative, and 'each case must be analyzed according to its own unique circumstances.'" *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 273 (D.C. Cir. 2020) (brackets omitted; quoting *Air Line Pilots Ass'n v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984)).

Application of these factors demonstrates that the FCC has not unreasonably, much less egregiously, delayed in considering MAD's application for review. Mandamus is therefore unwarranted.

### A. The FCC Has Taken a Reasonable Amount of Time to Consider the Issues in MAD's Application for Review.

#### 1. The Issues Are Numerous and Complex.

The "first and most important [TRAC] factor"—that "the time agencies take to make decisions must be governed by a rule of reason"—weighs against the grant of mandamus here. *Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *TRAC*, 750 F.2d at 80). The rule of reason cannot be applied "in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003); *Pub. Emps. for Env't Resp.*, 957 F.3d at 274 ("[T]here is no *per se* rule as to how long is too long." (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004))). The analysis instead is a "complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1100. Whether the agency's pace satisfies the "rule of reason" ordinarily depends upon considerations about "the complexity of the task at hand" and "the resources available to the agency." *Id.* at 1102, *see id.* at 1100.

The FCC has taken a reasonable amount of time to consider the MAD application for review—around 20 months as of the filing of this opposition—given the number and complexity of the issues raised in that proceeding, and the number of equally or more important matters competing for the agency's attention. *See id.* at 1102; *Sierra Club v. Thomas*, 828 F.2d 783, 799 (D.C. Cir. 1987) (finding that, in light of "the complexity of the issues facing [the agency] and the highly controversial nature of the proposal, agency deliberation for less than three years . . . can hardly be considered unreasonable").[1]

In its application for review, MAD argues that the Bureau misinterpreted section 309(k)(1) of the Communications Act by limiting the scope of WTXF's license renewal inquiry to matters occurring at that particular station. *See* Pet. Ex. M, at 1-2, 7-14. It also claims that Fox Corporation's "promotion of a false election narrative" is the kind of

---

[1] This Court has routinely denied mandamus petitions in cases involving much longer periods of agency inaction than that presented here. *See, e.g.*, *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477 (D.C. Cir. 1998) (ten years); *Her Majesty the Queen in Right of Ont. v. U.S. EPA*, 912 F.2d 1525, 1534 (D.C. Cir. 1990) (more than nine years); *TRAC*, 750 F.2d at 80-81 (almost five years); *Monroe Commc'ns Corp.*, 840 F.2d at 945-47 (delay of three years fell "so short of egregious" that it did not warrant mandamus).

conduct that "shocks the conscience" within the meaning of the Commission's character policy. *Id.* at 1, 2, 14-15. And it disputes that its petition to deny implicated the First Amendment interests of Fox Television, WTXF's licensee, and its parent company (Fox Corporation). *Id.* at 1, 15-17. All of this is in addition to charges that the denial of its petition to deny was "politically motivated," "arbitrary and capricious," and "not based on "developed facts or established law." *Id.* at 18-21.

It is entirely understandable that the Commission would need time to work through MAD's numerous and detailed objections to the Bureau's denial of its petition to deny. Indeed, as this Court has recognized, Commission decisions that may require the agency to "balance policy and constitutional concerns" can be "expected . . . [to] take longer than might rulings on more routine items." *Monroe Commc'ns Corp.*, 840 F.2d at 946. Particularly in light of the Commission's competing responsibilities, *see infra* pp. 16-18, it has not unduly delayed in resolving the issues raised in MAD's application for review.

### 2. The Commission Has Higher and Competing Priorities.

MAD's application for review is also only one of the FCC's "competing" and often "higher" administrative and enforcement priorities. *TRAC*, 750 F.2d at 80. As this Court has long recognized, "[a]n agency has broad discretion to set its agenda and to first apply its limited resources to the regulatory tasks it deems most pressing." *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987); *accord In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991); *Monroe Commc'ns Corp.*, 840 F.2d at 946; *see also* 47 U.S.C. § 154(j) (authorizing the FCC to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice"). Courts "are properly hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus to give it precedence over others." *Sierra Club*, 828 F.2d at 797; *accord Pub. Emps. for Env't Resp.*, 957 F.3d at 275.

In this case, since the application for review was filed, the FCC has conducted multiple rulemaking proceedings to meet statutory

deadlines,[2] safeguard national security,[3] and protect human health and safety.[4]

---

[2] *See, e.g.*, Rural Broadband Protection Act of 2025, Pub. L. No. 119-89, § 2, 140 Stat. 818, 818 (2026) (directing the FCC, not later than 180 days after the statute's date of enactment (i.e., by November 11, 2026), to "initiate a rulemaking proceeding to establish a vetting process for applicants for, and other recipients of," certain new funding awards of high-cost universal service support); *Upper C-band (3.98-4.2 GHz)*, Report and Order, Order of Proposed Modification, and Order on Reconsideration, FCC 26-46, 2026 WL 2186867, at *2, ¶ 4 & nn. 13-14 (July 24, 2026) (stating that a statute directs the FCC to "complete a system of competitive bidding not later than two years after the [statute]'s date of enactment (i.e., by July 4, 2027) for not less than 100 megahertz in the Upper C-band"); *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses*, Report and Order and Second Report and Order, 40 FCC Rcd. 5544, 5545 ¶ 2 & n.1, 2025 WL 3526317, at *1, ¶ 2 & n.1 (2025) (stating that a statute directs the FCC to "initiate a system of competitive bidding for licenses for unassigned AWS-3 spectrum" not later than 18 months after the statute's date of enactment (i.e., by August 23, 2026)).

[3] *See, e.g.*, *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Third Report and Order and Third Further Notice of Proposed Rulemaking, FCC 26-50, 2026 WL 2150324 (July 23, 2026); *Protecting Our Communications Networks by Promoting Transparency Regarding Foreign Adversary Control*, Report and Order, 41 FCC Rcd. 744, 2026 WL 297882 (2026); *Review of Submarine Cable Landing License Rules and Procedures to Assess Evolving National Security, Law Enforcement, Foreign Policy, and Trade Policy Risks*, Report and Order and Further Notice of Proposed Rulemaking, 40 FCC Rcd. 6481, 2025 WL 2377719 (2025).

[4] *Facilitating Implementation of Next Generation 911 Services (NG911)*, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 26-39, 2026 WL 2018708 (June 26, 2026);

MAD acknowledges that Congress set no specific deadline for the FCC to resolve applications for review that challenge license renewal grants, and that its application for review raises no human health or safety issues. Pet. 15 n.12. Its application for review therefore has no claim to be considered ahead of the Commission's equal or more pressing priorities. *See TRAC*, 750 F.2d at 80.

### B. MAD's Disparate Treatment Claims Go To The Merits, Not Delay, And Are Baseless In Any Event.

MAD contends that the Commission's delay in addressing its application for review was "egregious," Pet. 15, not because the delay was unduly lengthy, but because the Commission treated its petition to deny WTXF's license renewal "entirely differently" than the complaints filed by others against WPVI, WCBS, and WNBC, Pet. 19, and that this "disparate treatment" was unexplained, Pet. 20. But these are *merits* arguments against the Bureau order denying MAD's petition to deny;

---

*Modernization of the Nation's Alerting Systems*, Report and Order in PS Dockets 25-224 and 22-329, and Further Notice of Proposed Rulemaking in PS Dockets 25-224, 15-94, and 15-91, FCC 26-38, 2026 WL 1906899 (June 29, 2026); *Resilient Networks*, Third Report and Order, FCC 26-34, 2026 WL 1510386 (May 21, 2026).

they have nothing to do with whether resolution of MAD's application for review, whatever its merits, has been unreasonably delayed.

In any event, MAD's claims of disparate treatment—and its related claims of improper purpose grounded on those claims, Pet. 22-28—are baseless. MAD ignores significant procedural and substantive differences between its petition to deny WTXF's license renewal and the complaint proceedings that justify the FCC's actions.

MAD's petition to deny WTXF's license renewal application had been pending for more than eighteen months when the Media Bureau denied it. Pet. Ex. E, at 1, 2 ¶ 4. In those eighteen months, parties had been afforded the opportunity to submit, and the Bureau had received and reviewed, responses to the petition and the license renewal application. *Id.* at 2-3 ¶¶ 4-6. The Bureau then issued an order examining that record at length and explaining why the petition did not warrant an evidentiary hearing. *Id.* at 5-9 ¶¶ 10-19. The petition was denied because, among other reasons, its claims centered on allegations that false statements had been disseminated by Fox News, a cable network that the FCC does not regulate and that is not subject to the

same public interest obligations the Communication Act imposes on FCC-licensed broadcasters. *Id.* at 6 ¶¶ 13-14, 7-8 ¶¶ 17-18.

By contrast, the complaints against the ABC, CBS, and NBC stations were much more recent—pending for only two to four months before their denials—and concerned material that had aired on the regulated broadcast stations rather than on a cable network. *See* Pet. Exs. F, G, H. Moreover, at the time the complaints were dismissed, the FCC had only just created a public docket and had not had the chance to receive—much less consider—any responses to the complaints. *See* Preserving the First Amendment, GN Docket 25-11. (In any event, those complaints also remain pending before the Commission and have not been resolved.)

In short, as the January 22 orders reviving the complaint proceedings found, the January 16 orders denying those complaints had been "issued prematurely based on an insufficient investigatory record for the station-specific conduct at issue." Pet. Ex. J, at 1 ¶ 1; Pet. Ex. K, at 1 ¶ 1; Pet. Ex. L, at 1 ¶ 1. Reinstating those complaints so that the Commission could consider them on a developed record was "even-

handed treatment," not evidence of disparate treatment. Pet. Ex. Q, at 1.

### C. MAD Identifies No Interests that Would Be Prejudiced by Delay.

Finally, "the nature and extent of the interests prejudiced by delay" does not support mandamus. *TRAC*, 750 F.2d at 80. MAD claims that the FCC's delay in resolving the application for review causes prejudice in three different ways. None supports mandamus relief.

First, MAD claims that "[t]he delay prejudices this Court's authority by . . . undermining [its] ability to conduct meaningful judicial review." Pet. 28. But this Court will be able to conduct meaningful judicial review (if sought) once the Commission resolves MAD's application for review. *See* 47 U.S.C. §§ 155(c)(7), 402. And there is in any event no independent judicial interest in agency review on an accelerated timetable. *See FCC v. Brown*, No. 26A476, 2026 WL 3080098, at *2 (U.S. Oct. 14, 2026) (stating that "[t]he Communications Act . . . does not obligate the Commission to act [on an application for review] within a particular timeframe").

Second, MAD claims that the delay "prejudices core First Amendment interests" because of the "risk that the Commission has engaged in viewpoint discrimination." Pet. 29; *see* Pet. 29-30. But MAD fails to explain how grant of its application for review, which seeks to deny WTXF's license renewal and thereby cut off that station's ability to air its programming, would promote First Amendment interests. Likewise, disposition of MAD's application for review would do nothing to promote the First Amendment interests of the broadcasters in the separate complaint proceedings, *see* Pet. 30, to which MAD's application does not apply.

Finally, MAD claims that the delay deprives its members who view WTXF broadcasts "of their statutory right to receive broadcasts from a licensee whose reliability and truthfulness they can trust." Pet. 30-31. At the outset, MAD fails to explain why these viewer members cannot trust the programming content from WTXF. At no time has MAD provided evidence that the broadcast station—as opposed to its sister cable network (which the Commission does not regulate)—has ever aired false statements. Pet Ex. E, at 6 ¶¶ 13-14. In any event, it is precisely because of the importance of the public interest obligations

imposed by the Communications Act that it is incumbent on the Commission to take the time needed to examine claims that a broadcaster has failed to live up to its public interest obligations with care and deliberation.

## II. THERE IS NO NEED FOR DISCOVERY.

This Court also should deny MAD's alternative request for discovery into the reasons for the delay. Pet. 31-33. In the first place, as we have explained, *supra* pp. 13-18, the time the agency has taken to resolve MAD's application for review is not unreasonable, much less egregious. And MAD has not identified any case in which this Court—or any federal court of appeals—has ordered discovery in the context of a petition for mandamus to remedy agency delay.

Lastly, even in ordinary agency review cases, "judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made," *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981), and "[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Discovery is therefore unwarranted—as the cases upon

which Petitioners rely make clear—unless there is a "strong showing" that the record before the court is incomplete or that an exception otherwise applies. *E.g.*, *Cherokee Nation v. U.S. Dep't of the Interior*, 531 F. Supp. 3d 87, 96 (D.D.C. 2021). There is no such showing here. The issue before the Court is whether the FCC's delay is unreasonable; we have shown that it is not. There is no need for discovery to conclude that mandamus is unwarranted.

## CONCLUSION

The petition for writ of mandamus should be denied.

Dated: November 5, 2026

Respectfully submitted,


Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Deputy General Counsel*

Keith A. McCrickard
*Counsel*

*<u>/s/ Keith A. McCrickard</u>*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Federal Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

   ☒ this document contains 4,730 words, *or*

   ☐ this document uses a monospaced typeface and contains ___ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using __________ with _______________________________.

/s/ *Keith A. McCrickard*

Keith A. McCrickard
*Counsel for Federal Communications Commission*